## No. 14,359.

INDUSTRIAL COMMISSION v. NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY.

(88 P. [2d] 560)

Decided February 14, 1939. On petition for rehearing opinion modified, and rehearing denied March 13, 1939.

Mr. Byron G. Rogers, Attorney General, Mr. Walter
F. Scherer, Assistant, Mr. Bernard E. Teets, Special As-
sistant, for plaintiff in error.

Messrs. Grant, Shafroth & Toll, Mr. Wayne Bannister and Mr. H. Gayle Weller of counsel, for defendant in error.

Mr. L. Ward Bannister, amicus curiae.

*En Banc.*

Mr. Justice Bock delivered the opinion of the court.

This action was instituted by the Industrial Commission under the provisions of the state Unemployment Compensation Act, to enforce contribution by defendant company under its provisions with respect to wages payable for employment during the calendar month of December, 1936. Judgment of dismissal was entered below, to reverse which plaintiff commission brings the cause here for review.

The question presented for determination is whether a life insurance company is required to make contributions under the Colorado Unemployment Compensation Act (S. L. '36, 3rd Ex. Sess., c. 2, '35 C. S. A., '37 Supp., c. 167A), as amended, with respect to remuneration payable to persons employed by it to sell insurance, collect premiums, service policies, and to perform the necessary services incidental to any of these activities. Such persons, within the issues here involved, may also for convenience be designated as general, district, special and soliciting agents. In this opinion reference will be made to plaintiff in error, plaintiff below, as the commission, and defendant in error will be designated as the company.

The company is a Wisconsin life insurance corporation, doing business in the state of Colorado, dealing in life insurance and annuities only, and operates under what is known as the general agency system. Under this system, the company enters into contracts with general agents for the handling, selling and collection phases of

its business in specified territories. Each general agent maintains an office at his own expense and is responsible for the sales of insurance, for the collection of premiums, and the maintenance of records pertaining to these activities in his specified territory. His compensation is in the form of commissions on all policies sold in his territory and a percentage of the premiums collected in his territory on policies sold outside of his territory. He contracts with certain district agents and special agents, with the approval of the company. The district agent, in general, is responsible for carrying on the company's business in a specific area in the general agent's territory, and he also receives commissions on policies sold in his territory and a percentage of the collections in his district. The general agent and the district agent, subject to the approval and endorsement of the company, hire special and soliciting agents, who receive commissions on the policies sold. Soliciting and special agents may be full or part-time workers.

In Colorado there are about seventy-five agents of whom two-thirds are part-time, the latter comprising some twenty-five to thirty different classes of businesses, such as lawyers, farmers, school teachers, office managers, clerks and county assessors. But regardless whether they are full or part-time agents, they are confined by their contracts to the activities specified therein. Each contract contains a clause against construing it in such a manner as would create a master-and-servant relationship.

 ██ The issues made herein primarily center on what shall be considered ''employment'' within the meaning of that word as used in the Colorado Unemployment Compensation Act, as amended and appearing as section 19 (g) (5), chapter 260, S. L. '37. The company contends that the persons involved herein are independent contractors; that ''employment,'' as used in the act, relates primarily to the relationship of master and servant, and it is, therefore, to that extent exempt from the

provisions of the law. Much of the discussion in the briefs and oral arguments of counsel relate to this issue, and while such discussion has been helpful, we feel that we are controlled in our construction of the word "employment" as here used, by the statutory definition contained in the act itself. We quote as follows from section 19 (g), chapter 260, S. L. '37, page 1275:

"(5) Services performed by an individual for wages shall be deemed to be *employment* subject to this Act unless and until it is shown to the satisfaction of the Commission that—

"(A) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) such individual is customarily engaged in an independently established trade, occupation, profession, or business."

This statutory definition sets forth three conditions, and they are in the conjunctive. A showing of conformity with all three, to the satisfaction of the commission, is a prerequisite to exemption from coverage under the law.

In section 2 of the act the legislature sets up a guide to its interpretation and application. Its legal basis is the police power of the state. Its purpose is to assure a measure of security against the great hazard of unemployment in our economic life. That this hazard is real and not theoretical cannot now be questioned. Economic security has become almost synonymous in importance with political security in our national economy.

That insurance companies are included as employing units subject to the act cannot be questioned.

We quote from amended section 19 (d), S. L. '37, p. 1271: " 'Employing unit' means any * * * insurance company or corporation, whether domestic or foreign; * * * which has or subsequent to January 1, 1936, had in its employ one or more individuals performing services for it within this State. All individuals performing services within this State for any employing unit which maintains two or more separate establishments within this State shall be deemed to be employed by a single employing unit for all the purposes of this Act. * * * Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit shall be deemed to be employed by such employing unit for all the purposes of this Act, whether such individual was hired or paid directly by such employing unit or by such agent or employee, provided the employing unit had actual or constructive knowledge of the work."

It is undisputed that the persons here alleged to be covered by the provisions of the act receive their entire compensation in commissions. That "commissions" are included in the term "wages" as used in the act also is clear. We quote from Session Laws of 1937, chapter 260, p. 1278, section 19 (1): " 'Wages' means all remuneration payable for personal services, including commissions, bonuses, split-checks and the cash value of all remuneration payable in any medium other than cash. * * * The reasonable cash value of remuneration payable in any medium other than cash shall be estimated and determined in accordance with rules prescribed by the Commission."

Referring to the company's contention that the persons involved herein are independent contractors and therefore exempt from the operation of the act, and considering solely the legislative intent as it appears from the act itself, what do we find? When defining or referring to "wages," "employment," "employer" and "benefits" in the act the legislature deliberately avoids the use of the word "employee," and uses the much

broader term, "individual." That this indicates legislative intent as to who is covered, cannot be doubted. The terms "independent contractor" or "master and servant" nowhere appear. The act prescribes the statutory test, section 19 (g) (5), supra, and we must not be led astray by any other criterion. If we are controlled by the legislative intent, and we are, this is the only approach we can adopt in the determination of this problem. In this we are supported by our own decisions and those of other courts of last resort.

█ In a recent case before the Supreme Court of the state of Washington (*McDermott v. State*, 82 P. (2d) 568), it was contended that certain persons were lessees and therefore not covered by the unemployment law of that state, which law in all essential respects is the same as ours. In defining the term "employment" the court said: "It is unnecessary to determine whether the common law relation of master and servant exists between respondent and the barbers and other operatives in his shop, because *the parties are brought within the purview of the unemployment compensation act by a definition more inclusive than that of master and servant.*" (Italics ours.) Other authorities supporting statutory definitions as distinguished from common-law terms are: *Industrial Com. v. Continental Inv. Co.*, 78 Colo. 399, 242 Pac. 49; *Spano v. Western Fruit Growers, Inc.*, 83 Fed. (2d) 150.

█ That the legislature has the power to define terms used by it and that statutory definitions control judicial interpretation cannot be doubted. *Fox v. Standard Oil Co.*, 294 U. S. 87, 55 Sup. Ct. 333, 79 L. Ed. 780; *Steinberg v. United States*, 14 Fed. (2d) 564, 566. Here the statutory definition of "employment" is broad and inclusive, and it cannot be so construed as to limit the meaning to the relationship of master and servant without violating the legislative intent.

█ The first condition in the statutory test relates to freedom of control and direction over the performance

of services, both under contract and in fact. The test of freedom is either under contract or fact. Does the company control and direct the performance of services, or will it have the right to do so under the contract, if it desires to do so? We are not here concerned with details but with general control. The possibility of control in the future is as important as no actual control at the present.

The second test of exemption relates to whether the service is either outside of the usual course of business for which it is performed, or that it is performed outside of all of the places of business of the enterprise for which such service is performed. There can be no question that the sale and servicing of insurance policies is a service performed in the course of the business of the company. Our only concern here is whether the service by those seeking exemption under the act is performed outside of all of the places of business of the company.

The third test as to exemption from coverage is that the "individual" is customarily engaged independently in an established trade, occupation, profession or business. This would necessitate a showing by the company to the satisfaction of the commission that its agents are established in the business of selling insurance, independent of whatever connection they may have with the company. It may also have some bearing on those who work only part time in soliciting insurance and are customarily engaged in some other profession, business or occupation. We, however, emphasize that an individual who seeks exemption must satisfy the commission that the services which are performed by others meet the requirements of all three tests, and that a failure to conform to any one of them is sufficient to create statutory "employment," and such an "individual" is covered under the act.

▆▆▆ Is the evidence on this issue sufficient to warrant the commission in exercising its reasonable judgment in arriving at its decision that the company is liable

for contributions? That, after all, as to the issue of coverage, is the scope of our judicial review.

In discussing the evidence we shall be controlled primarily by the undisputed facts, such as the contracts and the "Rules and Instructions" governing the persons involved herein in their relations with the company. The question of control and direction, as set forth in section 19 (g) (5), is not a matter of degree. Undoubtedly, it relates to general control. It is not satisfied by some "detail" in which the individual may be free to exercise his own judgment. The power to terminate a contract for personal service at any time without liability is an important factor in arriving at a conclusion as to whether the individual is free of control and direction, "Because the right immediately to discharge involves the right of control." *Industrial Com. v. Bonfils,* 78 Colo. 306, 308, 241 Pac. 735. What, then, does the evidence show with reference to the power of the company to terminate the employment of the individuals here concerned? A termination clause such as the one below quoted is found in practically every contract involved herein: "It may be terminated * * * (c) at any time by the general agent or the company at will, without assigning any cause therefor, upon not less than thirty (30) days' written notice to special agent." The district agent's contract prohibits the use by the agent of "books, blanks, stationery, or canvassing material, or any advertising not so furnished or approved by general agent and the company." The "Rules and Instructions," which are a part of the contract of the agent, provides that, "Agents must not use any rate books nor blanks or figures illustrating the provisons of the company's policies or the benefits thereunder, except those furnished by the Company." The freedom of the agent is controlled and directed in many instances under the "Rules and Instructions," such as attaching to the delivery of a policy any slip, letter or document of any kind relating thereto; advising or producing the discontinuance of insurance;

printing anything relating to any other company or anything concerning this company, even at his own expense, without first obtaining approval; directly or indirectly instituting or beginning, or cause to be instituted, any action against the company, in which the company may be held liable as a garnishee or trustee. All the records and reports made by the agent under the contract belong to the company; the control and direction of the use of blanks; the direction as to correspondence; the choice and interviewing of prospects, and the investigation necessary before making recommendation; the time of delivering and payment for the policy, and numerous other directions. No different situation is presented by part-time agents. The company limits and controls all commercial activities of its agents, including part-time agents, which indicates the scope of control in forbidding them to do any business for other life insurance companies; they shall not engage in any business other than certain designated ones, except with the written consent of the general agent, and their contracts may be terminated at any time without assigning any cause, on not less than thirty days' written notice.

The evidence here is ample that the "individuals" involved herein did not meet the first test under section 19 (g) (5). Having failed in this, it is unnecessary, for our purpose, to review the evidence as to the second and third tests. We should say, however, that there is evidence in the record from which it could reasonably be concluded that the company also failed therein. The company in its brief admits that the provisions in all contracts are the same, with minor variations, and specifically sets out in detail what we believe to be limitations on the freedom of the agent within the meaning of section 19 (g) (5).

In the preface to the "Rules and Regulations," which are a part of the contracts herein, we find this language: "It is self-evident that a business involving such enormous detail as that of a large life insurance company

cannot be conducted in a haphazard way. There must be definite rules by which each detail will be carried to completion. Otherwise the various parts of the machine will not work smoothly and friction and loss of effort will result."

Here we have an admission of detailed direction under contracts with the "individual" involved herein. It would indeed require a revolutionary change in the conduct of the life insurance business, as shown by the evidence, to bring about a situation whereby its agents would be free from any control or direction.

All contracts between the individual and the company stipulate that "Nothing contained herein shall be construed to create the relation of employer and employee between the company and general agent." These contracts were prepared prior to the enactment of the unemployment compensation law. Whether or not they were included to avoid certain legal consequences of the contracts it is not necessary to determine. They may be considered as a slight element in assisting the court in a determination of the term "employment." In that determination we are concerned primarily with what is done under the contract and not with what the contract says.

In *Davis v. People, ex rel.,* 79 Colo. 642, 247 Pac. 801, Davis asserted that he was engaged by an employer, the Delta County Merchants and Manufacturing Association, composed of 121 members, to transport freight of all kinds between Grand Junction and Paonia and intervening points; that he was employed to haul for only those who belonged to the association. His contention was that he was an employee. The people took the position that he was a common carrier, subject to the public utility laws of the state requiring a certificate of convenience and necessity. It appeared that the association was such in name only; that in fact Davis was operating on his own account, and his contention that he was an employee was swept aside by the court. We said in the

opinion at page 644: "In determining whether a business is that of a common carrier 'the important thing is what it does, not what its charter says.' *Terminal Taxicab Co. v. Kutz, et al.*, 241 U. S. 252, 36 Sup. Ct. 583, 60 L. Ed. 984."

In the case of *Glielmi v. Netherland Dairy Co., Inc.*, 254 N. Y. 60, 171 N. E. 906 (1930), a contract of employment designated Glielmi, a dairy products deliveryman, a "salesman." In passing upon the relationship of Glielmi with the dairy company under the workmen's compensation law of New York, Judge Cardozo said: "We think there is evidence to sustain the finding of the board that claimant was a servant, employed to sell the milk and cream of his employer in return for a commission. The contract is adroitly framed to suggest a different relation, but the difference is a semblance only, or so the triers of the facts might find. * * * Much of his apparent freedom is in truth apparent only. * * * If he does anything at variance with the will of his employer, its policy or preference, he knows that his contract of employment may be ended over night. He is bound hand and foot as long as he works the route at all, his freedom an illusion, and his independence but a name."

So, in the instant case, we think that the evidence sustains the conclusion of the commission that the persons involved here are "individuals," whose activities are embraced in the term "employment," as used in section 19 (g) (5).

▆▆▆ The statute expressly exempts certain "individuals" from coverage under this act. The company contends that by implication there are other exemptions. We should not so construe the act to create other exemptions unless the legislative intent to do so clearly appears.

▆▆▆ The company argues earnestly and at length that various state unemployment compensation acts were drawn to satisfy the federal government and to harmonize with the federal social security act. It reasons, there-

fore, that the construction placed upon the federal act as to coverage should be followed by the commission and the court in construing the Colorado act. It cites state rulings and rulings by the federal department of internal revenue to sustain its contention that the "individuals" involved here are not covered by the act. We have considered the authorities suggested. We cannot agree with the contention of the company that there is such a similarity between the state and the federal acts as to require us to make the latter and authorities construing it a controlling factor in our conclusion.

The question as to what, if any, degree the federal law controls the state act was determined in *Steward Machine Co. v. Davis,* 301 U. S. 548, 57 Sup. Ct. 883, 81 L. Ed. 1279. Mr. Justice Cardozo, in passing on that identical question, as it involved an interference by the national government with state sovereignty, had this to say (pp. 593-4) : "A wide range of judgment is given to the several states as to the particular type of statute to be spread upon their books. For anything to the contrary in the provisions of this act they may use the pooled unemployment form, which is in effect with variations in Alabama, California, Michigan, New York, and elsewhere. They may establish a system of merit ratings applicable at once or to go into effect later on the basis of subsequent experience. Cf. §§909, 910. They may provide for employee contributions as in Alabama and California, or put the entire burden upon the employer as in New York. They may choose a system of unemployment reserve accounts by which an employer is permitted after his reserve has accumulated to contribute at a reduced rate or even not at all. This is the system which had its origin in Wisconsin. What they may not do, if they would earn the credit, is to depart from those standards which in the judgment of Congress are to be ranked as fundamental. Even if opinion may differ as to the fundamental quality of one or more of the con-

ditions, the difference will not avail to vitiate the statute.''

Considering the wide variation of the provisions of state unemployment compensation laws, approved by the federal social security board, there is a clear indication that no uniformity of coverage was required.

The record is clear that the Colorado act has a sufficiently independent basis, and that the federal act does not place any limitations upon our interpretation or the guide of interpretation contained in the act itself, as it relates to the issue here.

 The company further contends that, as related to the life insurance business, there are ''practical difficulties'' confronting the administrative agencies that make it impossible to administer the act successfully, and that, therefore, they should be exempt. Some of these practical difficulties to which reference is made are: the payment of agents on a commission basis; records of commissions paid to agents are not available because the remuneration is based upon the number and amount of policies sold; the amount of the contribution payable on their remuneration cannot be ascertained, because the agents may bear some of the expenses incurred in performing their services. These so-called practical difficulties are more theoretical than real. The enforcement of any new law has its administrative problems. As suggested by counsel for the commission, ''Courts cannot weigh the consequences of the exercise of legislative power,'' at least not in advance of specific action. The legislature, however, foresaw that there would be administrative problems, so it made statutory provision authorizing the commission to prescribe rules and regulations setting forth the method of allocation, when contributions shall accrue and be payable, and the question of who is deemed an individual covered by the act under the term ''employment.'' Section 19 (g) (5), supra.

There may be some features that will require further judicial construction. The commission in its rulings

may be arbitrary or unreasonable. The question of gross wages versus net wages may be such an issue, where properly raised in a judicial proceeding. The company may also have an opportunity of showing to the satisfaction of the commission, on a record made before it, that part-time agents may be exempt from the act under section 19 (g) (5). The record in the instant case is not sufficiently broad to warrant us in finally foreclosing this question. No constitutional questions have been urged and none has been considered.

Counsel for the commission urge, and we think with some reason, that even if the test of coverage in this case is a technical relationship of master and servant, notwithstanding the legislative tests of "employment" in section 19 (g) (5) of the statute, the company's agents are servants within that relationship and not independent contractors. Since it is our opinion that the activities of the company's agents are within the legislative definition of "employment" as set out in section 19 (g) (5), it is unnecessary for us to make a determination of the master-and-servant issue.

On petition for rehearing counsel for the company furnish us with a copy of an opinion of the Supreme Court of the state of Connecticut, in a case entitled *Northwestern Mutual Life Insurance Co. v. Tone*, 4 Atl. (2d) 640, in which an issue similar to that in the case at bar is involved. The Connecticut Unemployment Compensation Act (G. S. '37, Supp. c. 280A, section 803d) defines "employment," as to those covered under the act, to be "any service, including service in interstate commerce performed under any express or implied contract of hire creating the relationship of master and servant."

It will readily be recognized, therefore, that the Connecticut act, as to coverage, is somewhat narrower in its scope than the Colorado act. The Connecticut act covers only such service as involves the relationship of master and servant. It should be said, however, that a

reading of the opinion in the Connecticut case will disclose that the Supreme Court there placed a rather strained construction on the relationship of master and servant as applied to its Unemployment Compensation Act. Suffice it to say that its opinion confirms the conclusions we have reached in the case before us.

It was stipulated on the trial that should the court find adversely to the affirmative defense of the company, then judgment might be entered for plaintiff in the amount prayed for. Holding, as we do, that the agents of the company here involved are covered by the act, and in view of this stipulation, the judgment is reversed and the cause remanded, with directions to enter judgment in favor of the commission in accordance with the prayer of the complaint.

MR. JUSTICE BURKE dissents.

MR. JUSTICE YOUNG, who formerly concurred, now dissents.