## CHATELAIN v. THACKERAY et al.

No. 6128. Decided March 8, 1940. (100 P. 2d 191.)

Rehearing Denied, June 5, 1940.

526

*Gardner & Latimer,* of Salt Lake City, for appellant.

*John C. Davis* and *Thatcher & Young,* all of Ogden, for respondent.

*O. P. Soule,* of Salt Lake City, for defendant Howard A. Thackeray.

BAKER, District Judge.

This action arises out of an automobile-pedestrian collision which occurred at the intersection of Washington Boulevard and 37th Street, just south of the south territorial limit of the city of Ogden in Weber County, on the 8th day of February, 1938. On that occasion the plaintiff and his wife, Geraldine Chatelain, were walking upon the

highway when they were struck by an automobile driven by the defendant, Howard A. Thackeray. At that time there was in effect between said Thackeray and American National Insurance Company, the other defendant in this action, a written agreement whereby Thackeray was constituted the American National Insurance Company's agent, in terms that are hereinafter more particularly set out. As a result of the collision the wife of the plaintiff was killed, and the plaintiff himself was injured. The suit was instituted by plaintiff to recover damages for the death of his wife, and for the injuries suffered by him. The case was tried twice in the court below. Upon the first trial the jury returned a verdict for the plaintiff, which verdict, upon motion of the plaintiff, was set aside and a new trial granted. Upon the second trial a verdict was again returned in favor of the plaintiff and against both defendants. This appeal is taken by the defendant, American National Insurance Company alone, from the judgment entered on the second verdict.

Washington Boulevard runs north and south and is one of the main highways between Salt Lake City and Ogden. It also forms part of the route between Ogden and Morgan, the latter being the place where Howard A. Thackeray, the defendant, lives. 37th Street runs east and west and intersects Washington Boulevard. The region in the vicinity of Washington Boulevard and 37th Street contains numerous residences and business places, and there is a school about three blocks south and one block east of that intersection. There are no sidewalks upon Washington Boulevard in the vicinity of the 37th Street intersection, and for that reason the highway is customarily used by pedestrians.

In the vicinity of said intersection, and extending north and south therefrom, the highway is paved. The pavement consists of bituminous concrete, or what is commonly known as asphalt, or black-surface, paving. As originally constructed the pavement was 18 feet wide, but since that time the shoulders have been treated with oil for an irregular

distance of from 2 to 3 feet on each side of the original construction. At the corner of Washington Boulevard and 37th Street the width of the paved part of the highway varies from 18 to 20 feet. On either side of such paved portion of the highway there is a gravelled shoulder which varies from 6 to 10 feet in width.

On the evening of February 8, 1938, the plaintiff and his wife left the Ogden Golf and Country Club at about 40th Street and Washington Boulevard just south of Ogden City and proceeded to walk north upon Washington Boulevard toward the 37th Street intersection. They approached that intersection at about the hour of 7 o'clock in the evening. It had been storming all day, and, while the storm had ceased, the surface of the highway was still wet. It was dark enough at that hour to require that automobiles travel with their headlights burning. In pursuing their course toward the 37th Street intersection the Chatelains crossed to the east side of Washington Boulevard and walked in a northerly direction along the gravelled shoulder of the road east of the paved portion thereof. Geraldine Chatelain was walking to the right of her husband. He had his hand in his overcoat pocket, and she had her arm through his and her hand down in his overcoat pocket. As they thus progressed through said 37th Street intersection they were struck from the rear by a north-bound automobile owned and driven by the defendant, Thackeray.

Immediately after the collision the body of Mrs. Chatelain was lying at a point about 9 to 12 feet north of the north boundary of said intersection. She was unconscious and her body was prone with her head toward the east and her legs extending about to her knees over the hard-surfaced part of the highway. One of her slippers was off and was found by one of the witnesses at a point about 35 feet north of her body and 2 feet east of the oiled surface of the highway. Mr. Chatelain, the plaintiff, was also lying unconscious and prone about 6 to 9 feet north and a little to the east of Mrs. Chatelaine, with his head toward the

hard-surfaced portion of the highway. Mrs. Chatelain never regained consciousness, but died later on the same day. The plaintiff suffered a brain concussion, and other injuries, which produced some incapacitation and necessitated some medical care and treatment.

The Thackeray car, after striking the Chatelains, proceeded across the hard-surfaced portion of the highway and came to a stop at a point about 200 feet north of the north boundary of said intersection and in front of the Uintah Dairy, which is a building on the west side of Washington Boulevard at about that point.

The evidence is in conflict as to the precise point upon said intersection the Chatelains were at the moment of the impact. The plaintiff's testimony is that he and his wife were about half-way across the intersection and at a point about 3 feet east of the hard-surfaced part of the highway on the gravelled shoulder thereof. Thackeray, and the witness E. B. Wood, who was a passenger in the car with Thackeray at the time of the collision, both testified that the Chatelains were walking at a point about 3 feet west from the east edge of the oiled portion of the road at the time of the impact.

Thackeray further testified that he was well acquainted with the part of Washington Boulevard here pertinent; that he had noticed people walking thereon; that his best judgment was that he did not see the Chatelains until he was 5 or 10 feet from them; that he thereupon turned to the left; that he believed he was so close to them when he first saw them that he could not have stopped his car before getting to them; that when he saw the Chatelains he did not apply his brakes or sound his horn, but turned to the left "to try to miss them;" that he was then travelling at the rate of about 20 to 25 miles an hour, and that at that time his vision was obscured by the glare of headlights on cars approaching from the north.

The only mark observed on the highway that might have been made by the Thackeray car was what appeared to be

a skid mark. This mark was about 2 feet west of the east edge of the hard-surfaced part of the highway, and about even with and directly west of the point where Mrs. Chatelain's body was lying.

The appellant, American National Insurance Company, is a Texas corporation, and at all times here mentioned was qualified to do and was doing a life insurance business in this state.

The written agreement between appellant and the defendant, Thackeray, was entered into on the 19th day of April, 1934, and, as has been said, was still in effect at the time of the accident, February 8, 1938. By its terms appellant constituted and appointed the defendant, Thackeray, its agent for the territory designated therein as "Morgan, Ogden, Utah and vicinity."

The agreement provides that the said H. A. Thackeray is appointed agent "to canvass and procure applications for ordinary life insurance in said company, in the territory named; to collect and pay over the premiums thereon to the company in cash on such insurance when effected, and to perform such other duties in connection therewith as may be from time to time required by the company, and for no other purpose whatsoever." It further provides, among other things, that the said agent should have no authority to alter or discharge any policy, to extend the time for paying any premium, to incur any liability on behalf of the company, or to enter into any contract or agreement whatsoever on behalf of the company. As to the powers and duties of the agent the agreement provides that the agent "shall devote his entire time and energies to the business of the company, carry out its instructions, promote its success and welfare, and shall do no business for any other life insurance company;" and further, that "the agent shall be governed by the written and printed instructions and rules which he may from time to time receive from the company," and that "all moneys received or collected for or on behalf of the company, shall be held by the agent in trust for the

company, and shall not be used by him  *  *  *  but shall immediately be deposited to the credit of the American National Insurance Company in a bank designated by the company or shall be paid over to such person as the company shall designate.  *  *  *"

The agreement then provides that the agency thereby created shall continue until terminated either by (1) death or resignation of the agent; (2) by either party giving notice in writing to the other at least thirty days before the date therein fixed for such termination; or (3) by certain embezzlements, defaults, or other misfeasance on the part of the agent or "for nonproduction of business for ninety (90) days."

Finally, the agreement sets forth a schedule of commissions to be paid by the company upon policies issued on applications procured by the agent.  This schedule provides that the agent is to receive a certain percentage of the premium paid upon such policies for the first year, and thereafter for ten years a smaller percentage upon subsequent premiums paid.  The latter are designated as "renewal commissions."  These commissions are the only compensation provided by said agreement for the agent.

The agreement, as has been noted, designates the defendant Thackeray's territory as "Morgan, Ogden, Utah and vicinity" and further provides that "such territory shall not be exclusive."  The evidence shows without dispute that Thackeray actually did sell insurance throughout the entire states of Utah and Idaho, and that he was free to sell insurance to anyone in either of those states.  The written agreement between Thackeray and the company is silent as to the mode of conveyance to be used by Thackeray in the prosecution of his agency in his territory, but the evidence shows that he used an automobile continuously throughout the period covered by said agreement.  The branch manager of appellant at Salt Lake City testified that he had ridden many times with Mr. Thackeray prior to February 8, 1938, in the latter's automobile, and that the purpose of such

rides was to solicit life insurance for appellant, and that appellant did not object to the use of automobiles by its agents. It also appears that about two years prior to the trial the defendant, Thackeray, received from the home office of the company a questionnaire which asked the kind of automobile the said defendant was driving, its serial and motor numbers, whether the defendant owned the car, and whether or not he carried liability insurance. The defendant furnished the company the information requested. The car he then owned was the same one he was driving at the time of the accident on February 8, 1938. Appellant also furnished blanks upon which reports of accidents in which its agents were involved were to be made. Mr. Zabiskie, manager of appellant's branch at Ogden, had also ridden with Thackeray in his said car for the purpose of selling life insurance for appellant, and there is other testimony in the record which establishes the fact that defendant's use of an automobile in the pursuit of his duties as an agent of the appellant was with the appellant's knowledge and consent. The automobile used by defendant was his own, and the expenses of its operation were not paid by appellant.

Thackeray was at liberty to go anywhere, at any time, and by what means he pleased, to sell insurance. Being paid upon a commission basis, however, it was to his interest and to the interest of appellant for him to sell as many policies as possible. When a policy was sold it was customary for Thackeray to collect the first premium. At times he also collected renewal premiums; particularly was this so when a renewal premium upon which he was entitled to a commission was about to become delinquent. In that event Thackeray might be notified from the Salt Lake City, or home office, that such was the case, and Thackeray would proceed to collect the premium directly from the policyholder. Sometimes, also, the home office, or the Salt Lake City office would hear of some one who was in the market for the purchase of life insurance, in which event such of-

fice would notify Thackeray and he would proceed to contact such person. On the day of the accident Thackeray was informed of some such person by the Salt Lake City office in the vicinity of Salt Lake City.

When Thackeray sent in an application for insurance from some person solicited by him, the next step was a physical examination of the applicant by some doctor designated by the company. If the applicant passed that physical examination, and was otherwise acceptable to the company, a policy was issued to him. Such policy was customarily delivered to the applicant by Thackeray.

The company maintained its main branch office at Salt Lake City and a district office at Ogden. On the door of the office at Ogden the name of the company appears, and also the name of its representatives, including that of Howard A. Thackeray. Thackeray, however, kept no regular office hours, and was not required by the company to do so. He used the office at his convenience in the prosecution of the business of his agency. Neither did he have regular hours within which to call upon prospective purchasers of life insurance. He called upon them at such times as he deemed most advisable or convenient in the pursuit of the business of his agency.

On the day of the accident Thackeray accompanied by one E. A. Wood, another agent of appellants, drove to Salt Lake City from Ogden in Thackeray's automobile. It was on the return to Ogden from such trip that the accident occurred. The purpose of Thackeray in going to Salt Lake City on that occasion was three-fold: first, to confer with Mr. Vogler, the manager of the appellant's branch in Salt Lake City, and get out, with his assistance, a "proposal letter" concerning salary savings insurance (a standard form of life insurance written by appellant) upon the employees of the City of Ogden and the Utah Bottling Works; second to turn in some money to the company which he had collected on policies of insurance sold by him and some applications for insurance from persons he had solicited; and, third, to make some collections for appellant.

Thackeray and Wood left Ogden about 8 or 9 o'clock in the morning. After arriving in Salt Lake City they had a conference with Mr. Vogler, and with his assistance prepared letters outlining a plan of salary savings life insurance to be presented to the Ogden City employees and the employees of the Utah Bottling Works. Mr. Thackeray and Wood had been working on such a plan prior to their trip to Salt Lake City, and had gone there to consult Mr. Vogler and prepare the proposals before presenting them to their prospective purchasers. If such proposals had been accepted, he would have received a commission thereon. While at Mr. Vogler's office Thackeray also turned in some money he had collected on policies sold by him for appellant, a part of which was to be returned to him as commission. While in Salt Lake City he made three or four calls upon persons either to solicit the writing of insurance for them, or to collect upon insurance already written. On the return trip to Ogden Thackeray stopped at Bountiful and saw a "prospect" there, and stopped at Uintah where he made an unsuccessful attempt to make a collection. Had such collection been made, he would have received a commission therefor from appellant. After leaving Uintah he proceeded directly toward Ogden and the point where the accident occurred.

Upon the first trial in the court below the jury returned a verdict in favor of the plaintiff and against both defendants, and assessed his damage as follows:

For the death of his wife ..................... $1,000.00
For personal injuries ........................ 100.00
For special damages ......................... 274.87

Thereupon the plaintiff filed notice of intention to move for a new trial, setting forth, among other grounds relied upon therefor, "inadequate damages appearing to have been given under a misapprehension of the facts and law by the jury." Upon such motion being made a new trial was granted, the trial judge stating in open court upon that occasion

that the new trial was granted solely upon the ground that the damages were inadequate.

Appellant assigned numerous errors, but they are all resolved into three propositions, and are so presented and argued by it. They are as follows:

First. That the trial court erred in granting a new trial upon motion of plaintiff as above recounted.

Second. That under the undisputed evidence the defendant Thackeray was an independent contractor, and that, therefore, appellant company was not responsible for his asserted acts of negligence.

Third. That the undisputed evidence establishes that the plaintiff and his wife, Geraldine Chatelain, were guilty of contributory negligence which proximately caused their respective injuries.

In support of its contention that the trial court erred in granting a new trial, as aforesaid, upon motion of the plaintiff, the appellant relies heavily upon the decision of this court in the case of *Hirabelli* v. *Daniels,* 44 Utah 88, 138 P. 1172, 1174. That case, appellant asserts in substance, was conclusive upon the trial judge in the instant matter, and his disregard of it constituted such an abuse of discretion as merits a reversal by us upon this appeal. The Hirabelli case, with Mr. Justice Straup speaking for this court, asserts first of all that where the proceedings of the first trial which are excepted to, or deemed excepted to, are preserved and before the court for review that an order granting a new trial is reviewable upon appeal. Such proceedings and exceptions have been preserved and are before us now, and we therefore deem it proper to review the order of the trial court granting a new trial.

The opinion in that case further asserts:

"Under these provisions [among others, the statutory provision now designated as Sec. 104-40-7, Revised Statutes of Utah, 1933] the court had the undoubted power to set the verdict aside and to grant a new trial. Granting or refusing a new trial on these grounds of necessity largely rests within the sound discretion of the trial court.

We can only review such a ruling on an alleged abuse of discretion, and can disturb it only when such an abuse is made to appear." And further, "But in either case [i. e., granting of a new trial in the case of excessive or inadequate verdicts] to justify the court in interfering it should be made to appear that the jury plainly disregarded or misconceived the instructions or the evidence, or acted under the influence of passion or prejudice."

In the *Hirabelli* case the plaintiff sued for damages for injuries resulting from an assault and battery. He claimed that the defendant had struck him with a pair of shears, producing a cut over the eye about an inch long, which required three stiches. The injury was temporary, and the plaintiff testified that "the eye hurt me about two weeks. Maybe it hurt me three or four weeks." On the first trial of the case the trial court instructed the jury in part as follows:

"If you find for the plaintiff you will assess his damages at such sum as will compensate him for all bodily pain he has suffered, if any, not exceeding the amount alleged, to wit, $1,000.00."

That was the only instruction given as to the subject of general damages. The other instructions on damages related to specified items. The jury returned a verdict of $1 for general damages. This court in remarking upon that verdict stated in the further course of its decision that the trial court had restricted plaintiff's general damages to pain suffered; that there can be no fixed rule to measure the amount of damages to be awarded for pain suffered; that the matter is properly left to the sound discretion of an unprejudiced jury; and that it did not appear that the jury had disobeyed or misconceived the instruction of the court. After setting out further reasons, to which the reader is referred in the report of the case above cited, this court concludes that the trial judge abused his discretion in granting a new trial, and therefore ordered a reinstatement of the judgment upon which the new trial was granted.

We do not think that the Hirabelli case is necessarily decisive of the instant case. Both the facts and the proceedings of the court in connection therewith are different, and in applying the principles laid down in the Hirabelli case a different result might properly be reached. Geraldine Chatelain, wife of the plaintiff in this case, was nineteen years of age when she was killed. She and the plaintiff had been married since June 21, 1937, that is, for a period of about seven and a half months. Her life expectancy, according to the American Experience Table of Mortality which was introduced into evidence, was 42.87 years. She was in good health. She and the plaintiff lived together at the Ogden Golf and Country Club, where the plaintiff was employed. She assisted him in the performance of his duties there, and on special occasions, perhaps two or three times a week, was paid extra for her services at the rate of two or three dollars a day. The foregoing facts are not controverted.

Upon the occasion of the first trial in the case now before us, the jury were instructed with regard to general damages, if their verdict was for the plaintiff, that they should award plaintiff such sum of money as they believed would justly compensate him. With respect to damages suffered by plaintiff as the result of the death of his wife the jury were instructed that they might consider the age and occupation of the said Geraldine Chatelain at the time of the injury which caused her death, her bodily health, the length of time she might be expected to live but for such injury, and her habits and mode of life. From the foregoing it is to be seen that the jury was not limited to "pain suffered" in arriving at a verdict for general damages, as was the jury in the Hirabelli case. They were to justly compensate the plaintiff, considering the elements above stated, for the pecuniary damages suffered by him as a result of the death of his wife.

The jury were also instructed that, if they found that the plaintiffs were guilty of contributory negligence, then

their verdict should be for the defendant, and that under no circumstances were they to attempt to weigh the degree of negligence of the respective parties, and award damages on the theory that one party was more negligent than the other. By its verdict for the plaintiff the jury necessarily determined, then, not only that the defendants were negligent and that such negligence was the proximate cause of plaintiff's injuries, but also that plaintiff and his wife were free from contributory negligence. *Sassano* v. *Roullard*, 27 Cal. App. 2d 372, 81 P. 2d 213; *Donnatin* v. *Union Hardware Co.*, 38 Cal. App. 8, 175 P. 26, 177 P. 845. Thus, the smallness of the jury's verdict may not properly be attributed to a compromise as to the amount of damages on any theory of comparative negligence, or diminution of damages because of contributory negligence on the part of plaintiff, as is intimated by appellant in its brief.

In our review of the trial court's ruling granting a motion for a new trial we are limited to a determination of whether or not it appears that such ruling was an abuse of discretion (*Hirabelli* v. *Daniels,* supra), and as was said in the Hirabelli case "we are * * * slow to interfere with a ruling granting or refusing a new trial on questions relating to damages." The question, in light of the foregoing, is whether or not it appears that the verdict of $1,000 for the death of plaintiff's wife was so small that the trial court in setting aside that verdict acted in a realm beyond its province, that is, whether it was unjustified in concluding that the jury had disregarded or misconceived the instructions given it, or the evidence. We hold that no such abuse of discretion appears, and that the trial court acted within its discretion in granting a new trial.

In arriving at that conclusion we are not unmindful of the general principle that the trial judge may not substitute his judgment for the judgment of the jury as to what constitutes a fair compensation to the injured party in an action for the damages sustained by him. The amount of damages in a jury case is (generally) a

matter that is within the peculiar province of the jury. However, when the amount assessed by a jury bears no proper relation to the wrong suffered as shown by the evidence and in accordance with the instructions of the court, then a proper case is presented for the exercise by the court of its power to set aside verdicts. In this case the age of the decedent, the condition of her health, her expectancy of life, and the services rendered by her, render the award of $1,000-.00 made by the jury to the plaintiff for her loss palpably inadequate, and indicates that the jury either disregarded or misconceived the evidence, or the court's instructions.

As was said by the Virginia Court of Appeals in *Rawle* v. *McIlhenny*, 163 Va. 735, 177 S. E. 214, 221, 98 A. L. R. 930:

"The evidence introduced upon the first trial, in so far as it relates to the amount of damages, was without material conflict. Upon a consideration of it, we are not able to say that the court was plainly wrong in setting the verdict aside on the ground that the amount of the verdict was so inadequate as to warrant the inference that the jury had misconceived the evidence as to the extent of Mrs. McIlhenny's injuries. For that reason its action in so doing will not be disturbed."

The Supreme Court of New Hampshire in *Doody* v. *Boston & M. R. R.*, 77 N. H. 161, 89 A. 487, 489, Ann. Cas. 1914C, 846, quite aptly explains the function of a ▮ trial judge in setting aside verdicts for inadequacy or excessiveness of damages in the following language:

" 'Where the verdict is decidedly against the weight of evidence, so that it is apparent that the jury must have misunderstood or totally disregarded the instructions of the court thereon, or must have neglected to consider the facts, and overlooked prominent and essential points in the evidence, where it is such a verdict that 12 honest and intelligent men would not have returned it, it is the duty of the court to set it aside.' This statement of the law was not intended to authorize the court to weigh the evidence, consider conflicting testimony, or pass upon the credibility of witnesses—clearly the peculiar province of the jury—but to determine in view of all the circumstances

disclosed whether the jury properly performed their duty under the instructions of the court."

The primary purpose of the trial of a case is to render justice between the litigants. To that end the court has the power to exercise a reasonable control over its verdicts and when they fail to reflect such justice in accordance with the evidence and the law as embodied in the in- ■ structions, to set them aside, and order a retrial of of the cause. The smallness of the verdict in this case, viewed in light of the uncontroverted evidence, leads to the conclusion, that it was arrived at under a misapprehension or disregard of the instructions and the evidence—perhaps, as a result of compromise wherein some jurors sacrificed their conscientious view of the evidence in order to arrive at a verdict—and a proper situation was presented by the trial judge to exercise his power to set aside verdicts. *Conroy* v. *Reid,* 132 Me. 162, 168 A. 215; *Whitney* v. *Milwaukee,* 65 Wis. 409, 27 N. W. 39; *Doody* v. *Boston & M. R. R.,* 77 N. H. 161, 89 A. 487, Ann. Cas. 1914C, 846; *Phillips* v. *Railway,* 5 Q. B. 78, 85 (quoted in *Doody* v. *Boston & M. R. R.,* supra); *Schuerholz* v. *Roach,* 4 Cir., 58 F. 2d 32; *Sassano* v. *Roullard,* 27 Cal. App. 2d 372, 81 P. 2d 213; *Wallace* v. *Miller,* 26 Cal. App. 2d 55, 78 P. 2d 745; *Bencich* v. *Market St. Ry. Co.,* 20 Cal. App. 2d 518, 67 P. 2d 398.

It is to be noted in connection with the cases cited above that the question of a new trial on the issue of damages alone, as in *Rowle* v. *McIlhenny,* supra, is not involved in the case before us. The new trial in this case was upon all issues. In connection with the California cases just cited it should be noted that while in California the ground for granting a new trial because of the inadequacy of damages in that the evidence is insufficient to justify the verdict (*Peri* v. *Culley,* 119 Cal. App. 117, 6 P. 2d 86; *Taylor* v. *Northern Electric Ry. Co.,* 26 Cal. App. 765, 148 P. 543) and the trial judge upon a motion for a new trial sits as a "thirteenth" juror and weighs the evidence, and is not

limited, as in this jurisdiction, to determining whether or not the jury have misconceived or disregarded the evidence or the law, nevertheless, we have cited the cases above from that jurisdiction as being instructive upon the question of the court's discretion in granting a new trial.

Now as to appellant's second contention: That under the undisputed facts in the case Thackeray was an independent contractor, and not an employee of appellant. The precise point at which the differentiation between the status of agent or servant and independent contractor occurs is elusive. It is one of those fields wherein the line of demarcation may not be drawn with arbitrary certainty, but wherein it is in large measure to be discovered anew under the varying facts presented by each case. In drawing such line certain general rules are helpful and almost universally serve as guides. The rule of broadest and most universal application is the right of control as to the manner of doing the work to be performed under the contract. 39 C. J. 316; *Wooton* v. *Dragon Consol. Min. Co.,* 54 Utah 459, 181 P. 593. If such right of control belongs to the principal or master then the person doing the work is not an independent contractor, but is an agent or servant. It is to be noted in this connection that it is not actual interference in the work that denotes the agency, it is the right to interfere that makes the difference between an independent contractor and a servant or agent. 39 C. J. 1317; *Ludlow* v. *Industrial Commission et al.,* 65 Utah 168, 235 P. 884, 888.

In conjunction with the foregoing certain other rules are useful and sometimes controlling in determining that distinction. Thus, in *Ludlow* v. *Industrial Commission et al.,* supra, after rather an exhaustive review of prior decisions of this court and a discussion of the whole question as presented under the facts of that case, this court remarks:

"In our opinion, the very crux of the case is involved in the idea that an independent contractor can employ others to do the work and accomplish the contemplated result without the consent of the con-

tractee, while an employee cannot substitute another in his place without the consent of his employer."

Examining cases from other jurisdictions, in addition to the foregoing rules, some turn upon the question of whether a person doing the work was engaged in an independent business, e. g., a garageman who repairs automobiles brought to him for that purpose, and is responsible only for achieving that final result. *Mattocks* v. *Emerson Drug Co.*, Mo. App., 33 S. W. 2d 142.

Some place great weight upon whether the person performing the service is liable to discharge, or may resign, without incurring liablity to the other party. *Dillon* v. *Prudential Ins. Co.*, 75 Cal. App. 266, 242 P. 736.

In the particular matter of one who is engaged to solicit the sale of insurance policies, to make collections thereon, and to perform other services connected with the contact between an insurance company and its policy-holders, either actual or prospective, there are many and diverse holdings as to whether such person is an agent or servant or an independent contractor. This diversity is simplified and explained, however, if it is kept in mind that each case depends in large measure upon its own peculiar facts. There are indeed cases, e. g., *Vert* v. *Metropolitan Life Ins. Co.*, 342 Mo. 629, 117 S. W. 2d 252, 116 A. L. R. 1381, cited by appellant in this case, which go so far as to say that a person who is ordinarily designated as a life insurance agent is not within the classification of a servant or employee subject to direction as to how he attempts to accomplish results. Such general statements, however, are to be regarded with caution. The status of servant or independent contractor is not determined by the appellation given the employment, or him who performs it, but by the facts of the individual case viewed in light of the rules for determining such status, as before in this opinion stated.

Appellant cites and relies upon a number of cases wherein persons commonly designated as "insurance agents" were held to be independent contractors, among which the fol-

lowing are the most strongly emphasized: *American National Insurance Company* v. *Denke*, 128 Tex. 229, 95 S. W. 2d 370, 107 A. L. R. 409; *Vert* v. *Metropolitan Life Ins. Co.*, supra; *American National Insurance Company* v. *Kennedy*, Tex. Civ. App., 101 S. W. 2d 825, which was affirmed, *Kennedy* v. *American National Ins. Co.*, 130 Tex. 155, 107 S. W. 2d 364, 112 A. L. R. 916; *American Savings Life Insurance Company* v. *Riplinger*, 249 Ky. 8, 60 S. W. 2d 115, and *Wesolowski* v. *John Hancock Life Ins. Co.*, 308 Pa. 117, 162 A. 166, 87 A. L. R. 783. We have examined each of those cases and find that in each of them the facts may be differentiated from the facts in this case.

As has been said, one of the tests most frequently applied in determining whether one is an agent or servant or an independent contractor is that of the right of control which is retained by the master or principal, and in the case of the use of an instrumentality, such as an automobile, by the agent or servant, there can usually be no right of control on the part of the principal or master unless the use of such instrumentality is with either the express or implied assent of the latter. *Kennedy* v. *American National Life Ins. Co.*, supra; 42 C. J. 1128. What are the facts with regard to that in this case? In the first place, it is conceded that the written contract between the agent Thackeray and the company does not mention the means of transportation to be used by Thackeray. It does, however, define his territory, and that, as is disclosed by the undisputed evidence, was construed to be the entire states of Utah and Idaho. His duties were to solicit and sell insurance within that territory, to deliver the policy and to collect the first premium, at least, upon sales made by him, and to perform other duties as might be directed by the company. Moreover, the contract provided that he was to devote his entire time and energies to the business of the appellant company, to carry out its instructions, and do no business for any other life insurance company. From the beginning of his relationship under the contract in 1934 until the time

of the accident in 1938, Thackeray had customarily used an automobile in the conduct of the business of his agency. Moreover, such use was known to appellant and was with appellant's consent and acquiescence.

Can it reasonably be said, in view of the foregoing, that appellant did not, impliedly at least, authorize the use of an automobile by Thackeray in the prosecution of its business? We are of the opinion that it cannot. From every reasonable point of view the use of an automobile by Thackeray must have been within the contemplation of both parties when the written agreement of April 19th, 1934, was executed. At a time when the use of automobiles is common it is not reasonable to conclude that any other means of transportation was within the minds of the parties when the contract was made. Thackeray's territory being, as it admittedly was, many thousands of square miles in extent. The selling of insurance was an essential pursuit of appellant and Thackeray was brought under contract to assist it in the prosecution of that pursuit. Under Thackeray's contract he was to devote his whole time to appellant's business, and promote its success and welfare. The more insurance he succeeded in writing, the greater the profit both to himself and his principal. To increase appellant's business within Thackeray's extensive territory was the main object of Thackeray's employment, and the attainment of that object was certainly much facilitated by the use of an automobile. Under such a state of facts the conclusion is inescapable that Thackeray was authorized and, in effect, directed, to use an automobile in his prosecution of appellant's business. *Dillon* v. *Prudential Ins. Co. of America,* 75 Cal. App. 266, 242 P. 736; *Dishman* v. *Whitney,* 121 Wash. 157, 209 P. 12, 29 A. L. R. 460; *Fidelity Union Life Ins. Co.* v. *McGinnis,* Tex. Civ. App., 62 S. W. 2d 186.

Moreover, and to remove all reasonable inferences to the contrary, that was the practical construction put upon the contract by the parties themselves. Thackeray, as has been said, used an automobile at all times in the exercise of the

functions of his agency. He lived at Morgan, his district headquarters were at Ogden, and the company maintained its main branch office for the State of Utah at Salt Lake City, all of which places are at such a distance apart as to require the use of some means of mechanical conveyance. On the day of the accident he drove from Ogden to Salt Lake City on business for appellant. He made several calls on the same business in Salt Lake City. On the way back to Ogden, where he intended to work on appellant's business that evening, he stopped at two intermediate points, Bountiful and Uintah, both stops on business for the company.

Thackeray's actions on that day indicate the nature of his daily activities under his contract with the company, and indicate that the only reasonable way the business of his agency could be carried on was by automobile. His movements on that day covered a linear territory of about 40 miles, and between the terminals of that territory he made intermediate stops. These stops were facilitated, and perhaps made possible by the fact that Thackeray's means of transportation, that is, an automobile driven by him, was under his immediate physical control, and was therefore obedient to his will, as, for example, a train or trolley car running on a fixed schedule would not have been. Thackeray was not using an automobile for his "own personal convenience and comfort," as was said of the agent in *American National Insurance Company* v. *Kennedy,* supra [101 S. W. 2d 827], he was using it in the vital pursuit of not only his own, but appellant's business, and he was under appellant's control, not only as to the results to be obtained from that pursuit, but, impliedly at least, as to the means whereby he obtained them.

Moreover, Thackeray was performing a personal service for the company, under its rules and regulations, and had no power to contract with others to perform such service for him. These facts are again significant in determining Thackeray's relationship to the company, and following *Ludlow* v. *Industrial Commission et al.,* supra, indicates that the relationship was that of employer and

employee, and not contractee to independent contractor. It may also be noted that Thackeray's contract provided that his agency might be terminated by the company upon thirty days' notice. Such power to discharge may be one of the factors which may be considered as indicative of the control retained over the person performing the service by the person at whose instance it is done, and usually points to the relationship as being that of master and servant. *Industrial Commission* v. *Northwestern Mutual Life Ins. Co.*, 103 Colo. 550, 88 P. 2d 560. And Thackeray was not engaged in such business as in some cases is determinative of the status of independent contractor. He was performing essential functions for appellant from which appellant expected to derive an advantage in furtherance of the object of its existence. *Mattocks* v. *Emerson Drug Co.*, Mo. App., 33 S. W. 2d 142.

Neither the fact that Thackeray was paid solely upon a commission basis, nor that he used his own automobile and personally paid the expenses of the operation thereof, is controlling in determining when the relationship of employee exists. *Curcic* v. *Nelson Display Co.*, 19 Cal. App. 2d 46, 64 P. 2d 1153; *Westlock* v. *John Hancock Mutual Life Ins. Co.*, supra; *Margulis* v. *National Enameling & Stamping Co.*, 324 Mo. 420, 23 S. W. 2d 1049.

We deem it unnecessary to discuss in detail the question raised in some of the cases here cited as to the distinction between an agent and a servant. Where the superior has right of control over his subordinate as to the means used by the latter in the conduct of the purposes of the relationship, that distinction becomes merely academic, since in either event the rule respondeat superior applies. In this case, as was the agent in the Denke case, Thackeray was engaged partly to effect contractual relations between appellant and third persons, and partly to do physical errands for it—as when he delivered policies, made collections or turned over money to appellant. The purpose of his trip to Salt Lake City on the day of the accident com-

prised all of these latter duties, as well as the duty of soliciting sales of insurance, so that again the making of the distinction between servant and agent is obviated.

From the foregoing we conclude that Thackeray was an employee of appellant company at the time of the accident in question, and not an independent contractor as urged by appellant. Since, furthermore, the injuries to plaintiff resulted from the negligence of the agent, Thackeray, while he was about appellant's business, and within the scope of his employment, appellant is liable to plaintiff for the injuries so inflicted, and plaintiff is entitled to recover, unless barred by contributory negligence as asserted by appellant. The latter matter will be discussed later in the course of this decision.

Among other cases which support the conclusion as to Thackeray's status here reached is that of *Fidelity Union Life Ins. Co.* v. *McGinnis,* Tex. Civ. App., 62 S. W. 2d 186, a Texas case, hereinbefore cited. We mention it particularly, because of the subsequent ruling, also from Texas, in American National Insurance Co. v. Denke, which has been already discussed to some extent in this opinion. Appellant suggests that the latter case substantially overrules the former. In that connection the annotation in 116 A. L. R., at page 1392, contains this remark:

"The force of this decision (i. e. in the McGinnis case, supra) is much weakened by *American National Ins. Co.* v. *Denke,* 128 Tex. 229, 95 S. W. 2d 370 [107 A. L. R. 409] * * * although it was not overruled and the two may be reconciled on a slight difference in facts as set out above."

We are of the opinion that the two may be reconciled because of the difference in facts, and serve well to illustrate how divergent conclusions may be reached because of a difference in facts.

Cases, other than those already cited, which support the conclusions herein reached with regard to Thackeray's status as an agent or servant of appellant are the following: *Hall* v. *Sera,* 112 Conn. 291, 152 A. 148; *Burdo* v. *Metropolitan Life*

*Ins. Co.*, 254 App. Div. 26, 4 N. Y. S. 2d 819; *Fischer* v. *Havelock*, 134 Cal. App. 584, 25 P. 2d 864; *Borgstede* v. *Waldbauer*, 337 Mo. 1205, 88 S. W. 2d 373; *Industrial Commission* v. *Northwestern Mutual Life Ins. Co.*, 103 Colo. 550, 88 P. 2d 560; *Knapp* v. *Standard Oil Co.*, 156 Or. 564, 68 P. 2d 1052; *May* v. *Farrell*, 94 Cal. App. 703, 271 P. 789; *Woodward-Wanger Co.* v. *Nelson*, Tex. Civ. App., 11 S. W. 2d 371; *Magnolia Petroleum Co.* v. *Pierce*, 132 Okl. 167, 269 P. 1076, 61 A. L. R. 218; *Witaszek* v. *Drees*, 155 Misc. 838, 280 N. Y. S. 592; *Texas Power & Light Co.* v. *Denson*, Tex. Civ. App., 45 S. W. 2d 1001, adopted by the Supreme Court, *Texas Power & Light Co.* v. *Denson*, 125 Tex. 383, 81 S. W. 2d 36; *Great Atlantic & Pacific Tea Co.* v. *Noppenberger*, 171 Md. 378, 189 A. 434.

Appellant's third, and final, contention is that the undisputed evidence in the case establishes that the plaintiff and his wife were guilty of contributory negligence. As appears from the rather detailed statement of ▉▉▉ facts given at the beginning of this opinion, the evidence bearing upon that matter was in conflict, both as to matters of direct testimony and inferences to be drawn from facts and circumstances in evidence. Under such circumstances the trial court properly submitted the question of contributory negligence to the jury. The jury found against appellant on the issues thus presented, and we are bound by that finding. *Pence* v. *California Mining Co.*, 27 Utah 378, 75 P. 934; *Genter* v. *Conglomerate Min. Co.*, 23 Utah 165, 64 P. 362; *Angerman Co., Inc.* v. *Edgemon et ux.*, 76 Utah 394, 290 P. 169, 79 A. L. R. 40; 4 C. J. 850.

The judgment is affirmed, with costs.

MOFFAT, C. J., and WOLFE, LARSON, and McDONOUGH, JJ., concur.

PRATT, J., being disqualified, did not participate herein.