Nick PLATIS, Plaintiff,
v.
UNITED STATES of America,
Defendant.

Kenneth JONES, Plaintiff,
v.
UNITED STATES of America,
Defendant.

George MARICICH, Jr., Plaintiff,
v.
UNITED STATES of America,
Defendant.

Helen N. DAY and Roban Day, a minor,
acting by and through Helen N. Day,
her general guardian, Plaintiffs,
v.
UNITED STATES of America,
Defendant.

Nos. C 183–66, C 184–66, C 207–66,
C 211–66.

United States District Court
D. Utah,
Central Division.

Aug. 7, 1968.

Paul N. Cotro-Manes and Tom G. Platis, Salt Lake City, Utah, Therald N. Jensen, Price, Utah, for plaintiffs.

H. Ralph Klemm, Asst. U. S. Atty., Salt Lake City, Utah, for defendant.

RITTER, Chief Judge.

The present actions, under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), § 2671, and § 2674,[1] arise out of a head-on collision which occurred in Utah when Airman First Class Williams, a member of the military forces of the United States, driving his own automobile, ran into an automobile driven by Norman Day. Norman Day was killed, and three other men, passengers in the car driven by him, were seriously injured, one of them suffered a broken back and is 100% disabled. Helen N. Day, the widow of Norman Day, for herself, and as the guardian of their minor child, Roban Day, the three passengers, Platis, Jones and Maricich brought these suits against the United States, alleging that Airman First Class

1. *28 U.S.C.A. § 1346(b):*
"Subject to the provisions of chapter 171 of this title, the district courts, together with the [United States District Court for the Territory of Alaska,] the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*28 U.S.C.A. § 2671:*
"As used in this chapter and sections 1346(b) and 2401(b) of this title, the term—
" 'Federal agency' includes the executive departments and independent establishment of the United States, and corporations primarily acting as, instrumentalities or agencies of the United States but does not include any contractor with the United States.
" 'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.
" 'Acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States, means acting in line of duty."

*28 U.S.C.A. § 2674:*
"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages * * *."

Williams was negligent, that his negligence was the direct and proximate cause of the accident, that he was an employee of the government acting within the scope of his employment, and that his employer, the United States was liable vicariously under the doctrine of *respondeat superior*.

The United States answered and entered a general denial, plead contributory negligence, which was not proved.

In this state of the record, there are three questions to be answered:

1. Was Williams negligent and did his negligence cause the collision?

2. Was Williams an employee of the United States acting within the scope of his employment?

3. What, if any, damage was suffered?

We proceed to the evidence on these issues.

## NEGLIGENCE

At about 7:30 a. m., June 25, 1965, four miles west of Green River, Utah, a member of the United States Air Force, Airman First Class Williams, driving west on Highway U.S. 50 & 6, ran into a car driven by the decedent Day, who was driving east on the same highway with three other men in the car. They were on their way to work at the Atlantic Research & Missile Plant in Green River. It was a bright clear day, no clouds, and the sun was up. The road conditions were good, dry and level, a hard surfaced interstate highway, straight for a long distance both ways.

The impact was at a "T" junction of Highway U.S. 50 & 6 and Highway U–24, known as the Hanksville road, which takes off from the main highway and runs southerly. The highway east of the junction was plainly marked with a sign "JUNCTION AHEAD", and a sign "U–24" with arrow pointing south, and "U.S. 50 & 6" with arrow pointing west.

The highway at the junction was also plainly marked by three warning lines painted on the hard surface: a center broken white line and two yellow lines, one on each side of the broken white line, which indicated no passing at that point. And, those markings on the pavement extended back easterly toward Green River for a distance of approximately 900 feet. There were similar warnings for cars approaching the junction from the west.

The cars had struck and come to rest in the approach to Highway U–24, clear over beyond the line of the shoulder on the south side of U.S. 50 & 6.

Day had tried desperately to avoid the collision. His car laid down 97 feet of brake marks prior to the impact. He had pulled over to his extreme right until the marks of all four wheels were in the borrow pit, and the car slid along it to the point of impact.

The Williams car left no skid, scruff or brake marks of any kind anywhere on the road.

Airman Williams says in his deposition that he followed a white car out of Green River until it stopped at the Hanksville Junction.

Two passengers in the Day car who survived gave eye witness accounts. As they approached the intersection they saw a white car stopped there. They noticed another car (Williams) coming up behind it which "just came over in our lane of traffic, swung around the car and came into our lane of traffic." They saw the (Williams) car cross over the double yellow line, cross over the highway, and "it just turned right out in front of us and hit us."

The white car was attempting to make a left turn onto U–24. Witness Platis testified that he saw the left turn signal light operating on this car. The testimony of Jones was that he saw the left turn signal light operating and also a hand signaling a left turn.

To the judge advocate [2] at Hill Air Force Base, 19 days after the accident, Airman Williams gave a written sworn

---

2. Airman Williams made four statements:
 One at the scene of the accident to the

highway trooper, one 19 days after the accident to an air force judge advocate

statement in which he said: "I later found the vehicle in question (white car) was stopped and was going to make a left turn. At the time I observed the vehicle initially no signal was apparent; however between the time I first observed the vehicle and the time I realized that he was stopped, he did signal for a left turn." This sharply conflicts with his deposition taken nearly two years after the accident in which he says he saw no hand signal from the car and no turn light signal.

So Williams crossed over the double yellow and broken white lines. Not only that. He crossed over the entire width of what was for him the wrong side of the highway, crowded the Day car off the highway into the borrow pit and to the point of impact on U-24.

And Williams crossed those "NO PASSING" lines and passed the white car on the left while it was stopped at the intersection, signaling for a left turn in a lawful manner.

That Williams was attempting to avoid a rear end collision with the stopped white vehicle is admitted in the written sworn statement to the judge advocate 19 days after the accident: "I attempted to brake my vehicle to avoid a rear end collision with the stopped vehicle." And again he admitted it in his statement, two months after the accident, to an insurance adjuster in Portland: "I remember I was trying to avoid rear-ending another car—." But, when his deposition was taken nearly two years after the accident, he said in reference to this statement, "At that time (in Portland) I didn't know exactly what happened."

Note, however, he does not repudiate the same admission to the judge advocate 19 days after the accident. His memory two years after the accident ordinarily would not be as clear as 19 days or two months after. It is significant, also, that the *only* thing he remembered when he

talked to the insurance adjuster in Portland was this statement.

Williams was following another vehicle more closely than was reasonable and prudent. In his deposition taken in April 1967, Williams tells us that he had followed a white car out of Green River for quite a distance, (four miles), which had been traveling "right in front", at the same rate of speed apparently, 50 to 55 miles an hour, and "all of a sudden" he realized this car was "stopped or was slowing down, and I braked my car and this is where the accident started." The white car "appeared to be stopped in my lane of traffic, yes."

"Suddenly the distance shortened," and he tells us he thought he had to stop because of the rapid rate he was overtaking the white car. "Just before" he got "back of the white car" his car swerved to the left. "Upon hitting my brakes I began an immediate swerve into the left lane of traffic. At this time I saw there was an oncoming vehicle in the left lane." When he braked the car, it swerved to the left-hand lane and "I lost control of it."

Williams failed to keep a reasonable and prudent look-out for approaching traffic. His testimony indicates he was keeping no look-out at all. Nowhere in his testimony does he say he was looking ahead, on the watch for approaching cars. The government attorney wholly neglected to ask him about that.

If he had looked, he could have seen the Day car coming from a long distance up the road. It was a bright, clear morning, no clouds, and the sun was up. The sun was behind him and caused him no difficulty. The road conditions were good, dry and level. The highway was relatively straight. His view was unobstructed for a long distance up the road. A photograph in evidence shows these road conditions. There was no traffic except the three cars of plaintiff, defendant and the white car.

at Hill Air Force Base in Utah, another two months after the accident to an insurance adjuster in Portland, Oregon, and finally, a year and ten months after the accident, April 19, 1967, his deposition was taken.

When did Williams see the Day vehicle? His testimony is: "Upon hitting my brakes I began an immediate swerve into the left lane of traffic. *At this time* I saw there was an oncoming vehicle in the left lane." He also says at no time prior to the collision did he see the vehicle he hit.

"When I realized there was another car in the left lane *it was too late.*"

When I swerved into the other lane, I saw him, but it was just a split second. I couldn't tell what kind of car it was or anything else. *It was just there.*"

To counsel's question: "Q. Approximately how many seconds elapsed from the time you first noticed the white car slowing down until you swerved across the center line", Williams answered: I don't know. Very, very few. A very short time * * * two or three seconds."

Williams was not in the exercise of ordinary and reasonable care and prudence to keep his car under proper control. The witnesses in the Day car saw Williams' car come up behind the white car, swing around it, and come into their lane of traffic. They saw Williams' car cross over the double yellow line, cross over the highway, and "it just turned right out in front of us and hit us."

To the highway patrolman at the scene, Williams stated: that he really didn't know what prompted him to make *"the pass;* he must have been fatigued or road hypnotized."

To the judge advocate and to the Portland insurance adjuster Williams said he attempted to brake his vehicle "to avoid a rear end collision with the stopped vehicle." When the car swerved he "lost control of it."

Williams admits in his deposition that he lost control of his car and panicked.

"Q. After you swerved over the center line, what next happened?

"A. I lost control of the vehicle."
* * *

"Q. Had you not lost control of the vehicle, would you be (sic) able to move back across the center lane and avoid the oncoming car?"

The witness: *"I believe so."*

And again, he says: "I put on my brakes and the wheel jerked to the left and I might have panicked, *but I did lose control of the car.*"

And again, "But at that point where *I did lose control* of the car, *I did panic.*"

Plaintiff's counsel asked Williams:

"Q. You testified you felt you had enough time to stop as you approached the white car?

"A. Yes.

"Q. Had you applied your brakes after you lost control, would you have stopped before coming past the white car?

"A. I believe so, yes.

"Q. If what you believe is correct, then, this collision would not have occurred had you braked?

"A. I am quite sure if I had retained control, complete control of the car, I could have avoided the accident, yes.

"Q. Do you feel the loss of control of the car was due to your panic or physical condition of that car?

"A. *I probably did panic.* It was due to what already happened.

"Q. What caused you to panic?

"A. The sudden jerking of the wheel into the other lane of traffic.

"Q. Was the panic caused because you saw the approaching Day automobile?

"A. Probably, yes.

"Q. If there was no car there, what could have caused the panic?

"A. If there was no car there, I doubt that I would have panicked. I could have just brought my car back to the correct lane of travel."

Then the government attorney by suggestive questions led a willing witness back to shelter: "I don't know what happened; I don't remember."

"Q. Except for the feeling of the jerk and the car going into the other lane, you really don't know what happened from that point until the impact, do you?

**260**

"A. No, I don't. As I said, it was just when the car got into the other lane that I lost control. I may have panicked. I don't know what happened.

"Q. You don't remember?

"A. I don't remember."

Williams' deposition is confusing and contradictory. The government attorney cross-examined his own witness, led him, suggesting his answers, which never tends to strengthen a witness' credibility. For example, the witness Williams was led and his answers suggested when he testified that he did not intend to pass the white car, he was going to stop behind it, and also when the witness denied that he voluntarily turned or swerved into the opposite lane of traffic. The answers are not his; they are the attorney's.[3] Neither one of them answers the question was Williams looking ahead, on the watch for approaching cars. We wonder why?

It is unfortunate that Williams did not testify at the trial. No explanation was given in the record why he came from his base in upper New York State to Las Vegas, Nevada, for his deposition, but did not come to Utah for either the deposition or trial.

Williams attempts to relate some causes to the accident, a blow out, a defect in the braking or steering systems, *"or something."*

When he braked his car it swerved to the left-hand lane "and I lost control of it." Asked about the type of swerve, he said "it just suddenly cut over as if the left wheel pulled. It jerked the wheel into the left lane * * *. I first thought it might be a blow out."

Asked if he knew of any mechanical defect in his car, he answered, "There must have been in the braking system or steering system *or something*, which caused it, but I didn't know beforehand."

The airman's testimony raises an issue about the condition of his car, particularly the brakes. The highway patrol trooper testified that he tested the brakes on the Williams car at the scene of the accident. He got in the car and pushed on the pedal to see whether or not there was any brake pedal; and there was. "There was (sic) good brakes." He checked the car twice since. Both times in December 1966. It still had brake fluid in it, and the pedal was still good. Two or three days later he went to the garage to check the brake lining. A hub had been removed. The officer looked at the brake lining, the brake drum and the brake shoe and found them in good condition. They were all right. He found "nothing out of the ordinary in the hub. There was a little black dirt that you will find in any hub if you take it off. There was no grease."

The left front tire was cut and torn by the impact. It was not flat before impact. Under the government attorney's cross-examination the officer was emphatic:

"Q. So, as far as you know, it was damaged by the impact?

"A. In my own mind, definitely, that is where it was damaged.

"Q. But you couldn't tell from looking at it whether it was flat before the accident, could you?

"A. With my—Not that tire. With our experience, if it had been flat before the impact, a flat tire leaves a mark down the highway.

"Q. But you didn't find any such mark?

"A. I sure didn't.

"Q. Did you look for such a mark?

"A. You betcha.

"Q. Did you ever make any test of the brakes of the Day vehicle?

"A. No, sir.

"Q. You didn't check that automobile for brake failure?

"A. There was evidence to show that he had brakes. He left 97 feet of skid marks prior to the impact."

3. "The voice is Jacob's voice, but the hands are the hands of Esau," Genesis xxvii 22.

Williams testified in his deposition that his car had a state inspection sticker on the windshield at the time of the accident. The car had been inspected in May 1965, around mid-month. He said the inspection consisted of: "a general safety check of the automobile, check of the tire treads, all your glass in the car, check the brakes, the steering, your ball joints, and what have you in the front, shocks, muffler, horn. They go through and pull off your brake drum and inspect your shoes and the lining, brake lining, and check your master cylinder and hose feed for your hydraulic brakes."

When inspected the muffler was repaired, "and I think the left front hose that feeds the brake was repaired also, because it was leaking."

At no time before he left Ent Air Base did he notice a tendency of the car to pull to the left, and he noted nothing wrong with his brakes.

Williams drove from Colorado Springs to Grand Junction "several hundred miles" on U.S. 50, and came over Monarch Pass, a high, steep, mountainous pass. He noticed nothing peculiar about the operation of the car in the mountains. It did not pull to the left on braking.

At the time he stopped at a light in Green River he noticed nothing peculiar or in particular in regard to the brakes on his car.

After Williams had his car inspected in May, he had no occasion to question the condition of his brakes, or his steering apparatus. Williams testified:

"Q. Was there any difference in the way the brakes functioned between the time before they were repaired and after they were repaired?

"A. There wasn't before I had them repaired, there wasn't enough leakage or whatever it was to be noticeable, actually. The pedal had gone down a little more or something, but I didn't notice it.

"It was when I took the car in for the July (May?) inspection that he told me my brake tube was leaking and so I told them to fix it.

"Q. The fact that repairs were needed was brought to your attention by the garage owner; is that correct?

"A. Yes.

"Q. By the mechanic?

"A. Yes.

"Q. But you, yourself, noticed no difference in the way the car performed?

"A. No."

■ In the light of what happened under the circumstances in this case, the court is convinced by at least a preponderance of the evidence that Airman Williams was negligent in the following particulars:

1. In crossing over the "No Passing" lines, and over the entire width of the left hand side of the highway, crowding the Day car off the highway, into the borrow pit, and running into it.

2. In passing the white car on the left while it was stopped at the intersection, signaling for a left turn in a lawful manner.

3. In following another vehicle more closely than was reasonable and prudent.

4. In failing to keep a reasonable and prudent look-out for approaching traffic. Covington v. Carpenter, 4 Utah 2d 378, 294 P.2d 788 (1956).

5. In failing to exercise ordinary and reasonable care and prudence to keep his car under control. Wardel v. Jerman, 18 Utah 2d 359, 423 P.2d 485 (1967).

6. In driving to the left side of the roadway when approaching within 100 feet of or traversing an intersection.

7. In not driving his car within a single lane and moving from such lane without *first* ascertaining that such movement could be made with safety.

At the time of this collision there were laws on the Utah Statute books that imposed upon Williams the duty:

(1) To drive his car on the right half of the highway.[4]

4. 1953 Utah Code Ann.Sec. 41–6–53(a).

(2) When overtaking and passing a vehicle proceeding in the same direction to pass to the left of such vehicle at a safe distance.[5]

(3) Not to drive to the left side of the roadway when approaching, within 100 feet of or traversing any intersection.[6]

(4) Not to follow another vehicle more closely than was reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.[7]

(5) To drive his vehicle as nearly as practical entirely within a single lane and not to move from such lane until he *first* ascertained that such movement could be made with safety.[8]

(6) Not to drive along the highway to the left of the double yellow lines painted on the pavement.[9]

█ Williams' violations of the standards of safety set by these statutes "is to be regarded as *prima facie* evidence of negligence, but is subject to justification or excuse." Klafta v. Smith, 17 Utah 2d 65, 68, 404 P.2d 659, 661 (1965). The government's evidence falls far short of fairly or reasonably warranting a finding of justification or excuse.

It is the judgment of this court that such negligence of Airman Williams was the direct and proximate cause of the death and injuries in these cases!

█ Further, there is no evidence of contributory negligence; consequently the affirmative defense must fail.

## SCOPE OF EMPLOYMENT

Airman First Class Williams, who had been in the Air Force over four years, was issued military orders which di-

rected him to proceed on permanent change of station travel status[10] from one permanent duty station to another.

Air Force Regulations provide members "shall be deemed to be in a travel status while performing travel away from their permanent duty station, upon *public business*, pursuant to competent travel orders." * * * "Travel Status", the Regulations say, "will commence with departure from permanent duty station," and includes, "Permanent change of station: Travel from one permanent duty station to another permanent duty station." [11]

The unit and major air command from which he was relieved by his orders was 4608th Support Squadron, Air Defense Command, Ent Air Force Base, Colorado.[12] The new unit, major air command and duty station to which he was assigned was 337th Fighter Group, Air Defense Command, Portland International Airport, Oregon.[13]

Before departing Ent Air Force Base, Colorado, he was handed "PERMANENT CHANGE OF STATION ORDER—MILITARY,"[14] "Special Order Number A-429,"[15] which was issued by "Commander, Headquarters 4600th Air Base Wing, Air Defense Command, U. S. Air Force, Ent Air Force Base, Colorado, dated 5 April 1965."[16]

The reassignment of Williams to Portland, Oregon was for the purpose of Air Force duty.[17] He was ordered to report to the commander at the new assignment not later than 1 August 1965.[18]

Williams requested delay en route, which was authorized, provided it "does not interfere with reporting on date specified and provided individual has

5. 1953 Utah Code Ann.Sec. 41–6–55(a).

6. 1953 Utah Code Ann.Sec. 41–6–58(a) (2).

7. 1953 Utah Code Ann.Sec. 41–6–62(a).

8. 1953 Utah Code Ann.Sec. 41–6–61(a).

9. 1953 Utah Code Ann.Sec. 41–6–63.

10. Item 1.

11. Ch. 3, Part B: Travel Status 3050.

12. Item 6.

13. Item 7.

14. This is Air Force form Aug. '63, designated AF 899.

15. Item 39.

16. Items 45, 40.

17. Item 8.

18. Item 9.

sufficient accrued leave." This is indicated by code in his orders.[19]

Williams' travel orders authorized him to use his own private automobile. This, too, is indicated by code in his orders.[20]

By Air Force regulation, Williams, while traveling on permanent change of station travel status with authorization to use his own private car was entitled to an allowance of mileage at the rate of 6¢ per mile, for the official distance of 1,353 miles from Ent · in Colorado to Portland International Airport in Oregon. Before Williams departed his base in Colorado he was advanced this mileage to Portland. Later on the overpayment for the distance from Green River, Utah, to Portland was deducted from his pay.

On 24 August 1965 Williams at Portland, Oregon, received in cash mileage for his wife's travel from Colorado to Green River, Utah.

Furthermore, Williams' travel order authorizes remuneration for this movement of his personal belongings, furniture, household goods, etc.[21]

Air Force Regulations authorize travel and transportation allowances to its members *only while actually* in a "travel status." And, they can't be in "travel status" by definition unless they are traveling on "public business." Supra, Note 11.

The date on which Williams was to be picked up on the rolls of the 337th Fighter Group (ADC) Portland International Airport, Oregon, was 7 July '65.[22]

The travel orders included a direction to the Airman to report to the nearest active Air Force Installation as soon as possible "in the event of general war or if the CONUS[23] is attacked."[24]

Williams' travel was deemed necessary for his military service. This appears by code "TDN" in his Permanent Change of Station Travel Order, Item 45. The Air Force Manual of Abbreviations of the Department of the Air Force defines TDN: "Travel as directed is necessary in the military service."

Less than 24 hours after Williams departed Ent Air Force Base, Colorado, the accident occurred. Williams was asked whether that time was charged against his leave record, or against the four days authorized travel:

"Q. You know in fact that was not charged against your leave; isn't that right?

"A. It was not."

This is a matter of record which the government could, and should, have produced. In the absence of the record the court received secondary evidence. There are several other records the government did not produce which would have been substantial aids in the search for the truth of this matter.[25]

Williams did not report to the commander at the new assignment as or-

---

19. Item 11, "DALVP", Air Force Manual (AFM 11–2) of Abbreviations (1 July 1965) p. 13, Department of the Air Force: "delay en route authorized chargeable as ordinary leave provided it does not interfere with reporting on date specified and provided individual has sufficient accrued leave."

And also Item 27: "Travel time will be computed per Chapter 26, Part 1, AFM 35–11. TPA with 4 days travel time."

20. Item 27: "TPA". Defined in Air Force Manual p. 28: "Travel by privately owned conveyance authorized." This, needless to say, does not mean he was *required* to use his car.

21. Item 29. "Dislocation allowance category." The word "other" is typewritten.

22. Item 12: "EDCSA": AFM 11–2 supra, p. 15: "Effective date of change of strength accountability."

23. Continental United States.

24. Item 35c.

25. (1) Williams' Military "201 file", which is the record of the individual in the service that goes along with him from station to station. It contains documents, orders, reports, accounting and personal history records, accrued leave, travel time, his status at various times, and one would suppose much valuable information concerning the events that this law suit is all about; (2) records of the admitting personnel at the Military Hospital in Portland; (3) date of Williams' return to duty; (4) records and papers of line of duty investigation relative to

dered, i. e. "not later than 1 August 1965."[26] One result of Williams' negligent driving is that he didn't arrive on time at Portland. It was in the interest of the Air Force that he drive carefully so he would do so. And to that end, at all times during the trip, Williams was accountable to the Air Force for all of his actions, including the driving of his private automobile. Can it seriously be claimed that the Air Force did not have the *right* and the *power to control* him in those activities affecting his safety and punctual reporting for duty?

He was admitted to the hospital in Portland 18 August 1965. He did not return to duty until some time *later than that.*[27]

Williams was subject to the Uniform Code of Military Justice, 10 U.S.C.A. Articles 111 and 134. Article 111 provides: A serviceman "who operates any vehicle * * * in a reckless * * * manner, shall be punished as a court-martial may direct."

Under the general provision of Article 134, "neglects" prejudicial to the good order and discipline of the military forces may be punished as a court-martial offense.

The United States Court of Military Appeals in Greenfeather v. United States, 13 USCMA 151, 32 C.M.R. 151, ruled that simple negligence is sufficient. The absence of due care, or an act of omission showing a lack of care for the safety of others that a reasonably prudent man would exercise under the circumstances is sufficient to sustain a conviction. It would appear, therefore, that Court of Military Appeals cases would sustain a conviction under the

Uniform Code of Military Justice in the case of an airman operating a vehicle negligently resulting in the death of another.

The Greenfeather case involved a fact situation comparable to that being considered in the instant cases.[28]

Williams testified he intended to go by way the most direct route possible to Portland, Oregon. He did not intend to go anywhere else until he got to Portland. His in-laws lived at Rockaway, Oregon, which is "just a matter of a couple of hours due west" of Portland, "in a little bit" from the coast. He had to go through Portland to get to Rockaway. He was going to leave his wife and baby with his wife's folks, report to his new station, and get the housing arrangements set up.

The only place he and his wife wished to visit was Rockaway, nearly 800 miles down the road from the accident, and *beyond* his new permanent duty station to which the Air Force had assigned him.

At the time of the accident, Williams was in fact on the most direct route from Colorado to Portland, Oregon—the route over which the "official highway distance",[29] for mileage allowance purposes had been computed. He had not deviated from that route in the slightest, and didn't intend to. While "delay en route chargeable as ordinary leave" was authorized in his travel order, he had taken no leave and didn't intend to take any until he reached his wife's folks home at Rockaway. He had planned no side trips.

Williams further testified he was travelling under orders at the request of the United States. He was ordered to remove himself from Ent Air Force

man's status on day of accident; (5) records and papers of the accident investigation; (6) regulations, etc. to enable Air Force to reach man on travel, leave, or delay en route status; (7) same as to ordering him to temporary duty at any time; (8) same requiring him at all times to conform to "standards of conduct, appearance, and *safety* expected of members of the Air Force."

26. Item 9 of Travel Order.

27. The date we do not know, see supra, Note 25.

28. The prosecution Williams was afraid of was the state prosecution, see supra, page 260.

29. M4155 subd. 1, 2b Travel Regulations.

Base, Colorado, to the International Airport, Portland, Oregon. He didn't have any choice in the matter; he didn't have "any say about it".

In a two-sentence [30] *per curiam* decision, in 1955, the Supreme Court of the United States held that the state law of *respondeat superior* controlled the determination whether a soldier in the United States Army was "acting within the scope of his employment."

Many cases were decided in the federal courts before Williams v. United States, supra, and a considerable number since. Those which have applied "federal law", or the law of different states, or which involved different factual situations, or are conflicting have not been useful in the consideration of these cases. The court in O'Brien v. United States, 236 F.Supp. 792, pp. 794–795 (District of Maine, 1964) summarizes them, as well, in our judgment, as it can be done:

"Both parties attempt to draw support from cases decided by federal courts throughout the country arising from accidents involving servicemen travelling by privately owned automobile between permanent duty stations. These cases, however, are of little help, both because of the different factual situations presented and because they have applied the law of other states or, in some instances before Williams v. United States, supra, federal law. Furthermore, they are conflicting. Generally, these cases have imposed liability upon the Government when the serviceman at the time of the accident was in travel status proceeding directly from his former to his new duty station. Cooner v. United States, 276 F.2d 220 (4th Cir. 1960); Hinson v. United States, 257 F.2d 178 (5th Cir. 1958); United States v. Mraz, 255 F.2d 115 (10th Cir. 1958); cf. Sample v. United States, 178 F.Supp. 259 (D.C.Minn.1959); Satterwhite v. Bocelato, 130 F.Supp. 825 (E.D.N.C.

1955); Purcell v. United States, 130 F.Supp. 882 (N.D.Cal.1955); Whittenberg v. United States, 148 F.Supp. 353 (S.D.Tex.1956) (civilian employee). Under similar conditions, however, other courts have reached the opposite conclusion. Chapin v. United States, 258 F.2d 465 (9th Cir. 1958), cert. denied, 359 U.S. 924, 79 S.Ct. 607, 3 L.Ed.2d 627 (1959); United States v. Sharpe, 189 F.2d 239 (4th Cir. 1951); cf. Jozwiak v. United States, 123 F.Supp. 65 (S.D.Ohio 1954) (civilian employee). On the other hand, in most cases the courts have refused to hold the Government liable when the accident occurred while the serviceman was on leave or delay en route status. United States v. Eleazer, 177 F.2d 914 (4th Cir. 1949), cert. denied, 339 U.S. 903, 70 S.Ct. 517, 94 L.Ed. 1333 (1950); Noe v. United States, 136 F.Supp. 639 (E.D.Tenn. 1956); cf. Kunkler v. United States, 295 F.2d 370 (5th Cir. 1961) (deviation). To the contrary, however, is United States v. Kennedy, 230 F.2d 674 (9th Cir. 1956); cf. Marquardt v. United States, 115 F.Supp. 160 (S.D.Cal.1953) (civilian employee). Because of the different facts involved and the differences in the laws of the several states in which they have arisen, no good purpose will be served by further discussion of these federal cases. This case must be decided upon its own facts and is governed by Maine law."

Under Williams v. United States, supra, we are obliged to apply the law of the State of Utah, which was the place of the accident; although cases involving the responsibility of the United States for damage caused in this type of situation can never arise in the state courts. This is due to the singular relationship of the United States to its military personnel, and, to the provision of the Tort

---

30. "This case is controlled by the California doctrine of *respondeat superior*. The judgment is vacated and the case is remanded for consideration in the light of that governing principle." Williams v. United States, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761.

Claims Act conferring *exclusive* jurisdiction upon the federal courts.[31]

It is, of course, obvious that state court *respondeat superior* decisions in areas of the law other than those involving the military do not produce precedents which are apposite.

Consequently the federal courts must search in the reports of decisions from the state courts for cases which are as nearly comparable as may be. None, ever, will be directly in point. The process is one of trying to match up sets of dissimilar facts, and applying to the facts of the case at hand the principles announced by the high court of the place where the accident occurred.

The principles of the law of agency respecting the central issue in these cases, have been elaborated clearly enough by the Supreme Court of Utah, in fairly comparable civilian cases, that one can reasonably anticipate that when the court has an opportunity to apply them to factual situations more nearly resembling those in the instant cases it will do so.

The unanimous decision of the Utah Supreme Court which, factually, comes closest to the cases at bar, and which may be as close as any civilian case we will ever be able to find,[32] is Chatelain v. Thackeray et al., 98 Utah 525, 100 P.2d 191 (1940). The Supreme Court affirmed a judgment entered upon the verdict of the jury, and held that the insurance agent was not an independent contractor, that he "was engaged partly to effect contractual relations" between the company and third persons, and "partly to do physical errands for it— as when he delivered policies, made collections or turned over money" to the company. "The purpose of his trip to Salt Lake City on the day of the accident comprised all of these duties, as well as the duty of soliciting sales of in-

surance." The court deemed it unnecessary to discuss the distinction between an agent and a servant. "Where the superior has *right of control* over his subordinate *as to the means used* by the latter *in the conduct of the purposes of the relationship*, that distinction becomes merely academic, since in either event the rule of *respondeat superior* applies." (98 Utah at pages 548–549, 100 P.2d at page 201).

The Supreme Court concluded since "the injuries to plaintiff resulted from the negligence of the agent, Thackeray, *while he was about appellant's business,* and *within the scope of his employment,* appellant is liable."

The court adopted the principles: (1) that it is the "right" to control, not the exercise of it that is essential; (2) that, "in the case of the use of an instrumentality, such as an automobile, by the agent or servant, there can usually be *no right of control* on the part of the principal or master unless the use of such instrumentality is with either the express or implied assent of the latter" (98 Utah at page 545, 100 P.2d at page 200); (3) that "actual control over the manner or means of driving the automobile at the very moment of the accident is not necessary; (4) that the sole purpose of the trip need not be the furtherance of the master's business, but the travel may be in part on the business of the servant (98 Utah at pages 536 and 547, 100 P.2d 191); that neither the fact that Thackeray was paid solely upon a commission basis, nor that he used his own automobile and personally paid the expenses of its operation, is controlling in determining when the relationship of employee exists.

Thackeray was a life insurance agent who travelled in his own car, and who was "authorized and, in effect, directed," to use the car in pursuit of the com-

---

31. 28 U.S.C.A. § 1346(b).

32. Transfer of a civilian employee by the corporation employer from his permanent duty assignment in Colorado to his new permanent duty assignment in Portland, though closer to a "churn case", wouldn't make the precedent any weightier.

pany's business. He paid his own car and travel expenses.

And, he was at liberty to go anywhere, at any time, and by what means he pleased, to sell insurance.

He was a full time employee under a provision of the written contract that the agent "shall devote his entire time and energies to the business of the company, carry out its instructions, promote its success and welfare, and shall do no business for any other life insurance company."

The contract further provided that "the agent shall be governed by the written and printed instructions and rules which he may from time to time receive from the company." The company retained the power to discharge him on 30 days notice.

The agent's duties were to sell insurance in the states of Utah and Idaho, to deliver policies, collect premiums, and to perform other duties as might from time to time be required by the company. As compensation he was paid commissions.

The company main branch office for Utah was in Salt Lake City; the agent's office and district headquarters were in Ogden; his home was in Morgan, 22 miles beyond Ogden in Weber Canyon.

On the day of the accident Thackeray drove from Ogden to Salt Lake City, accompanied by Wood, another agent of the company. It was on the return to Ogden from such trip that the accident occurred. There were three purposes for the trip: first, to confer with the main branch manager at Salt Lake City about proposal letters concerning salary savings insurance for employees of Ogden City and another employer in Ogden; second, to turn in some collections and some new applications for insurance; and, third, to make some collections and solicit prospects in Salt Lake. On the return trip to Ogden, the agent stopped at two towns, saw a prospect, and made an unsuccessful attempt to collect a premium. After this, the agent proceeded directly toward Og-

den and the point where the accident occurred.

While in Salt Lake City, Thackeray, Wood and the main branch manager prepared letters outlining a plan to be submitted to the employees of Ogden City and the other Ogden employer. Thackeray and Wood had been working on such a plan in Ogden before the trip to Salt Lake.

Thackeray intended to work on the company business that evening upon his return to Ogden. See 98 Utah 525 at page 547, 100 P.2d 191.

Thackeray turned in at Salt Lake some money collected and applications obtained, which he had brought from Ogden; he made 3 or 4 calls on persons in Salt Lake soliciting prospects or collecting premiums; on the return trip to Ogden, he made two stops to solicit a prospect and to make a collection. He was entitled to have some of the money received on all of this business returned to him as commissions.

Spelling out a comparison of the two cases may throw some light on the significant similarity. Both Thackeray and Williams drove their own cars, and were authorized by their employers to use them in pursuit of the employer's business on the trip in question. Thackeray paid his own expense of the trip; the United States paid Williams'.

Both had the option to choose mode of travel, by car or by whatever other means desired. (98 Utah at page 534, 100 P.2d 191). The government was indifferent to the mode of travel used.

On the trip, both were acting in furtherance of the employer's business, Thackeray travelling from the main office in Salt Lake to the company district office in Ogden, where he intended to work on company business that evening (98 Utah at page 547, 100 P.2d 191). Williams was carrying out his superior's orders and proceeding from one permanent duty station to another. His transfer to Portland was for the purpose of Air Force duty.

Williams intended also to go through Portland and on beyond to visit his wife's folks. Thackeray intended to finish some work on company business in the Ogden office, and then go home to Morgan.

On the trip from Ogden to Salt Lake and back to Ogden again, Thackeray was furthering the business of his employer and also his own. He was using his automobile "in the vital pursuit of not only his own, but appellant's business." (98 Utah at page 547, 100 P.2d at page 201.) Thackeray was entitled to commissions if prospective purchasers in Ogden accepted the proposals worked out in the Salt Lake office.

Both Thackeray and Williams were on a direct route to their destination; neither had deviated in the slightest.

Both were full time employees.

Williams' travel was necessary in the military service; Thackeray's travel to Ogden was essential to the evening work in the Ogden office.

Both employers had the right of control, the Air Force over Williams; the company over Thackeray. At all times during the trip Williams was accountable to his superior officers for all of his actions, including the driving of his private automobile. He was subject to discipline for driving recklessly. The company retained the power to discharge Thackeray on 30 days notice; to issue rules and instructions to him by which he was to be governed, and he agreed to carry out the instructions, "promote the company's success and welfare", and to perform other duties as might from time to time be required by the company.

It is obvious, of course, that there are differences between the two cases but they do not strengthen the government's position. First, the government paid Williams' transportation allowance covering the movement of his household goods and furniture; and, also paid travel allowances of 6¢ per mile for Williams' travel and 6¢ per mile for that of his wife. Part, at least, of this was

paid on August 24, 1965, at Portland, Oregon, long after the accident. This clearly appears to be a ratification by the Air Force of the acts of Williams. It was done with full knowledge. Second, the relationship of the subordinate Williams to his military superiors carried more authority over him than the insurance company had over Thackeray; and, this doubtless causes subordinates in the military to sense more keenly their responsibility, and must quicken the desire and the will to obedience. Third, the Air Force gave Williams a direct and formal order to "proceed" to Portland. He was doing just that. But he did a bad job of it. The Air Force business was being negligently performed.

Professor Mechem[33] explains the point by saying, " * * * considering the nature of the job, the smoking cannot be thought of independently but must be thought of rather as a (bad) way of doing the job. If a truck driver uses both hands to light his pipe and loses control of the truck, we do not exonerate the master by saying that smoking is not within the scope of his employment; we say that driving is, and that this was a bad way of driving. On the other hand if the driver throws away the match and ignites the neighboring field, presumably the master is not liable; that is not a way of driving a truck at all.

" * * * In the cases under discussion the servant is most commonly one employed to handle gasoline or some other highly inflammable substance. When his cigarette ignites the gasoline, we do not say it was a poor way to smoke —but smoking is no part of the employment; we say it was a poor way to pour gasoline."

It is significant and emphasizes the point of Chatelain v. Thackeray, supra, that the Utah court (98 Utah at page 544, 100 P.2d 191) rejected the Missouri case of Vert v. Metropolitan Life Ins. Co., 342 Mo. 629, 117 S.W.2d 252, 116 A.L.R. 1381. The government, in the

33. Outlines of Agency (4th edition, 1952) page 253.

cases at bar, relies heavily upon Bissell v. McElligott, 248 F.Supp. 219 (D.C. 1965); 369 F.2d 115 (8 Cir. 1966). That case was decided by both the district court and court of appeals upon the authority of Vert v. Metropolitan Life Ins. Co., and the Missouri law, which was stated to be: that an employer cannot be held liable unless "the right of the employer to control the physical acts or movements of the employee *at the very moment of the occurrence*", is established as a necessary element of plaintiff's cause of action.

The Fourth Circuit in Cooner v. United States [34] also rejects Vert v. Metropolitan Life Ins. Co., and the Missouri view which requires a showing that at the time of the accident, the master had the right to control the details and manner of the servant's driving.

And, instead, the view of Chief Justice Cardozo, while on the New York Court of Appeals is adopted in Cooner v. United States, supra, and in Utah. That view is expressed in Mark's Dependents v. Gray, 1929, 251 N.Y. 90, 167 N.E. 181:

"* * * Unquestionably injury through collision is a risk of travel on a highway. What concerns us here is whether the risks of travel are also risks of the employment. *In that view, the decisive test must be whether it is the employment or something else that has sent the traveler forth upon the journey or brought exposure to its perils.* * * *

"* * * *The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own.* Clawson v. Pierce-Arrow Motor Car Co., 231 N.Y. 273, 131 N.E. 914. If, however, the work has had no part in creating the necessity for

travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, *the travel is then personal, and personal the risk.*" (Marks' Dependents v. Gray, supra, 167 N.E. at pages 182–183. Emphasis supplied.)

The Missouri anomaly [35] also is rejected in the Tenth Circuit by Chief Judge Murrah in United States v. Mraz, 255 F.2d 115 (1958), and by Chief Judge Arraj of the Colorado District, in Courtright v. Pittman, 264 F.Supp. 114 (1967).

Four years before Chatelain v. Thackeray, the Utah Supreme Court decided the leading case of Fox v. Lavender, 89 Utah 115, 56 P.2d 1049, 109 A.L.R. 105 (1936). The case has had a profound influence upon the law of agency in Utah.

It is cited here for the illuminating opinion of Mr. Justice Wolfe,[36] in which he said:

"The test of whether one is the agent of the other depends upon the right of control of one over the other. The same principles of agency apply to the running of an automobile as apply to any other field of action. * * *

"Control as applied to the operation of an automobile may be broken down into its elements—the when, the where, and the how.[37] Complete control means that the principal could dictate when the car was to be used, the destination or where it should go, the route it should take, and how it should be driven, whether slow or fast, behind or around traffic, inside or outside the lane of traffic, etc. *It is not necessary that the principal should be physically able to so direct or control,*

34. 276 F.2d 220, at pages 227, 230–231 (4th Cir. 1960).

35. See Mechem, supra, at page 307, "the Pennsylvania anomaly."

36. One of the more eminent justices of the Utah high court.

37. See Riley v. Standard Oil Co. (1921), 231 N.Y. 301, 132 N.E. 97, 22 A.L.R. 1382: "* * * the answer depends upon a consideration of what the servant was doing, and why, when, where, and how he was doing it."

*but only that he has the right to. Such legal right of control arises out of the relationship of master and servant, where the servant is the operator of the car.* In contemplation of law, an individual employing a chauffeur or a corporation employing a hundred truck drivers *has the right of control over the servants driving their cars, although it would be, in fact, an impossibility to exercise it.* Each of such servants is in contemplation of law the agent or instrumentality through which the master acts, and in contemplation of law each is acting in place of the master or principal. Improvement in means of communication between a driver and an absent master may in time make possible actual driving by remote control. *In such case the master will be actually doing what in law he already has the right to do.*"

* * * "In this analysis we are only concerned with the question of *who had the right of control of the car while it was on the journey.*"

* * * "The purpose of the trip is material only in so far as it throws light upon the question of *agency or the question of who has the right of control during the trip.*

* * * "Therefore, the ultimate object of what is to be done at the end of the journey is not controlling, but simply *a circumstance to throw light upon the question of whether there was the right of control during the journey.* The inquiry must still be directed as to whether an agency existed in the operation of the car, or the more fundamental question of *whether there was the right of control on the part of another during the time the car was operated.*"

Although the point was necessary to the decision in Chatelain v. Thackeray, and the court referred to it, the case which establishes the "dual purpose" doctrine in Utah law is Carter v. Bessey et al., 97 Utah 427, 93 P.2d 490 (1939) where an employee of the Jewel Tea Company took orders, made deliveries of merchandise and collections. He chose his own routes in the area assigned to him but was instructed not to drive the company truck for personal use. He, at night, after making his last call, purchased a Christmas tree for his personal use, placed it on the running board and was proceeding at the time of accident along the most direct route to employer's garage situated across the street from employee's home. When driving around the corner and into the street to his home and the company garage, he ran into the plaintiff. At that time he was on his master's business to put the car, containing some of the company's undelivered goods, in the garage for the night, and on his own business to deliver the Christmas tree to his home across the street. The Supreme Court said:

"Appellant relies principally upon the case of Cannon v. Goodyear Tire & Rubber Co., 60 Utah 346, 208 P. 519 (1922), but the facts in that case are widely different from those in the case at bar. There the driver worked definite hours, and the accident occurred several hours after he had ceased his employment for the master and while he was using the truck upon business wholly and exclusively his own. Though he was driving the company's truck he was completely dissevered from the master's control or service. In the case before us, Bessey had not completed his day's work for the master. He was still about his master's business though also incidentally attending to some purposes of his own. That such dual activity does not *ipso facto* discharge the master from liability is settled by the overwhelming weight of authority. A slight deviation from orders or attending incidentally to other business than the master's, but which does not dissever the servant from the master's business does not relieve the master from liability for the servant's negligence. If the servant is about the master's business even though also attending to private affairs, he is within the scope of his employment and the master is liable. But when the servant, for purposes of his own or for purposes other than the master's business, is en-

gaged in activity which has no relation to the master's business, to his employment, he has for such time departed from the scope of his employment and the master is not liable for his negligence.

" \* \* \* We entertain no doubt that this question was properly submitted to the jury, and its findings in that regard should not be disturbed."

In the excellent case note in 45 Minnesota Law Review 275, at 277, the author says " \* \* \* if the right to control present in the military situation were found in a civilian situation, the existence of the master-servant relationship would be clear." [38] The insurance company's right of control in Chatelain v. Thackeray, supra, and generally in insurance salesmen cases, comes pretty close. They "are full time employees, most emphatically doing the business of their employer \* \* \* and functioning under constant exhortation and direction as to the manner at least in which they negotiate. Indeed, when one reads in some of the cases of the daily routine of the insurance salesman, beginning with a pep meeting at eight a. m. and terminating with another one at six p. m., with statements of sales made, rewards for those who have been successful and reprimand for those who haven't, one gets the impression that it is not adequate to call these salesmen servants; they are more like slaves." [39]

The government's contentions were, first that the Air Force had no right to control the airman's driving because he had the election to travel any way he might choose, the specific means of travel being a matter of indifference to the service; and second, he was using his own car.

The statutory and employment arrangement in case of a member of the armed forces is such that the Air Force had the right, if it desired to exercise it, to tell the airman how he should travel. Cooner v. United States, 4 Cir., 276 F.2d 220, 234. 45 Minnesota Law Review 278, 278, Note 18. The regulations do not preclude the government from controlling military personnel while travelling; quite the contrary, as we have seen, supra.

Third, the government contends that driving a car was not one of the airman's customary duties. Periodic travel from one permanent duty station to another permanent duty station is, however, a normal and customary part of military service, as witness the numerous cases which have arisen in this field. To refer to but a few, the following cases squarely hold against the government contentions: Cooner v. United States (4th Cir. 1964), supra; United States v. Mraz (10th Cir. 1958), supra; Hinson v. United States (5th Cir. 1958), supra; O'Brien v. United States (Dist. of Maine 1964), supra; Courtright v. Pittman and United States, (Dist. of Colo. 1967), supra.

The fourth government contention is that Airman Williams "was ordered to go on a vacation for thirty-three days. He was never on the government's business when (sic) he left the Ent Air Force Base. At the time of the accident he had taken one day of leave. He was on leave at the time the accident occurred."

---

38. Hinson v. United States, 257 F.2d 178, 181 (5th Cir. 1958), "If control of the servant is thought to be the touchstone of vicarious liability, it is as adequately supplied here as is ever possible when driving servants are involved. For the Uniform Code of Military Justice made Capt. Westcott accountable to the Army for all of his actions, including the driving of automobiles, from the date of his entrance upon active duty. This was in no way altered by the indifference of the Army to the route or mode of travel selected. While 'acting in line of duty,' 28 U.S.C.A. § 2671, is generally equated with traditional notions of scope of employment, Cannon v. United States, 5 Cir., 243 F.2d 71, 73, the phrase reflects that Congress had in mind, and so must we, the special factors characteristic of military activity and discipline."

39. Mechem Outlines of Agency, (4th Ed., 1952) pages 305–6.

Even the young airman gave a better analysis than that (Deposition page 70):

"Q. You stated you were not engaged in any duty of the Government at the time you were driving from Ent to Portland; that is not entirely correct, is it?

"A. Well, I was still on active duty status; however at the time I was on vacation or leave status. I don't know what bearing that would have."

The government cited the so-called "going to and coming from work" cases.[40] The Fifth Circuit, in Hinson v. United States, supra, distinguishes these cases by asserting: " * * * The battle lines here drawn on scope of employment separate the camps into the question in its simplest, most graphic form: Was Capt. Westcott 'going to work' or was he then already 'at work' in making his way to Texas? The total circumstances under Georgia law compel the latter view.

" * * * Thus it is controlling that at the time of this collision, Capt. Westcott was performing a specific duty which had been assigned him—to *travel* to Fort Sam Houston. In executing this order to *proceed,* he made use of his private automobile with the express authority of the Army. For this the Army bore the expenses which were 'necessary in the military service.' In so doing he was not going to work, he was then engaged in the performance of one of the very duties specifically assigned to him, receiving Army pay, subject to military discipline and not on leave. His only choice was the immaterial one of route and means of travel.

"In this regard, the 'going to work' cases are distinguished * * * on the ground that the employee has not yet commenced his duties while en route to work. That is, he is not yet doing that which he has been ordered to do." Hinson v. United States, supra, is annotated in 45 Minn.L.R. 275, 277.

■ Contrary to the government's position, the evidence is overwhelming that Williams was engaged primarily in the furtherance of the business of the Air Force; was acting within the scope of his employment; and was carrying out military orders at the time the accident occurred. Some of the many factors in this case which demonstrate the right of Williams' superiors in the Air Force to control his driving activities are:

1—He was issued military orders to "proceed" on permanent change of station travel status from one permanent duty station to another. (Travel Order, Item 1, "Individual WP on PCS.").

2—The reassignment of Williams to Portland, Oregon was for the purpose of Air Force duty. (Travel Order, Item 8.).

3—His travel order states that "travel as directed is necessary in the military service." (Travel Order, Item 45 "TDN".).

4—At all times during the trip Williams was accountable to his superior officers in the Air Force for all of his actions, including the driving of his private automobile.

5—By statute he was subject to discipline for driving any vehicle in a reckless manner.

6—The accident occurred less than 24 hours after he departed his permanent duty station in Colorado.

7—The time between departure and accident was not charged against his leave record.

40. Cobb v. Kumm, 367 F.2d 132, pages 133, 134 (7th Cir. 1966), decided under Illinois law, "It is well established in Illinois that an employee who is on *vacation* cannot render his employer liable for that which he does in furtherance of his *private pursuits* during such period", Voytas v. United States, 256 F.2d 786, 789 (7th Cir. 1958). Denver & R. G. W. R. R. Co. v. Industrial Commission, 72 Utah 199, 269 P. 512, 62 A.L.R. 1436 (1928); Fidelity & Casualty Co. v. Industrial Commission, 79 Utah 189, 8 P.2d 617 (1932). That these are Industrial Commission cases, under modern social legislation, suffices to distinguish them quite apart from the point made in Hinson v. United States, infra.

8—He was specifically authorized to use his own private automobile.

9—He was reimbursed at a rate of 6¢ per mile for using his personal car.

10—His personal belongings, furniture, household goods, etc., were moved for him by and at the expense of the government.

11—He was entitled to travel and transportation allowances only if he was in "travel status", which requires that he be travelling on "public business".

12—If the government is right in its contention here, the General Accounting Office must file a claim against him.

13—While "delay en route chargeable as ordinary leave" was authorized, he had taken no leave and didn't intend to take any until he reached his wife's folks' home at Rockaway, Oregon. Moreover, he was entitled to a delay en route only if "individual has sufficient accrued leave." There was no evidence that he had any accrued leave.

14—He had to go through Portland and *beyond* the permanent duty station to which he had been assigned to get to Rockaway.

15—The first time he intended to take any leave was at Rockaway, nearly 800 miles down the road from the accident.

16—Williams intended to go by way of the most direct route to Portland.

17—At the time of the accident, Williams was in fact on the most direct route.

18—He had not deviated from that route in the slightest and didn't intend to.

19—Williams testified he was travelling under orders at the request of the United States. He didn't have any "say about it."

## LA RAISON D'ETRE

The world's work is done by agents, most of it by corporations which can act *only* through agents. "The present status of the corporation as the dominant factor in modern business nearly furnishes an automatic justification of *respondeat superior*. The corporation could not exist without the law of principal and agent. A corporation can only act through agents; no one would deal with it if it were not bound by the acts of its agents. " * * * The present writer has observed elsewhere that if there were no law of Agency it would be necessary to invent one. Large scale business would be impossible without it. Thus the rule of *respondeat superior* is congenial to and consistent with our industrial civilization. It may need no other justification." [41]

A good deal has been written on the subject of the *raison d'etre* of *respondeat superior*. "The explanation or justification of master's liability which undoubtedly finds the widest acceptance today is one that goes under the rather pretentious name of the Entrepeneur Theory. Every industry, it is suggested, takes a regular and more or less predictable annual toll, both in property and in flesh and blood. If, e. g., the records of the Shantytown & Southern Railroad were examined and subjected to a statistical computation, it could be predicted with considerable accuracy how many people would be killed and maimed in the coming year, how many cars wrecked, and the like. Restaurants doubtless have an accounting item named 'breakage'; this is breakage, too, if on a bigger and more distressing scale. On whom should the replacement cost fall? Unlike the restaurant, the railroad can get new victims without cost; to do so, however, leaves a tragic list of innocent and uncompensated victims. Why not treat it as a cost of the business, as the restaurant does? If the railroad pays, it will easily be able to spread the cost by raising its charges. The expense then ultimately rests, like other expenses of running a railroad, on that part of the public which needs, patronizes, and presumably profits by the existence of, a railroad. The cost, to each individual member of the railroad-interested public, is, per accident, in-

---

41. Mechem, supra. pp. 244–245.

significant; if left to lie on the victim of the particular accident it may be ruinous.

"Thus in the light of the Entrepreneur Theory, *respondeat superior* achieves an allocation of the loss which is fair and reasonable; no better justification, it is thought, could be needed."[42]

If, as Mechem says, "a corporation nearly furnishes an automatic justification" of *respondeat superior*, the United States government furnishes an *a fortiori*, fully automatic, peculiarly applicable one.

 The Tort Claims Act reflects a strong public policy, recognized by Congress, to protect the citizenry from torts committed by the public servants, to lift the risks that may be ruinous if left to lie upon the individual victim of the particular accident, to adopt *respondeat superior* as it is understood in the law of the states, and to achieve an allocation and apportionment of the loss among not a relatively small segment of the consuming public, but among the entire federal taxpaying public.

We have come a long way since Holmes wrote in 1882:[43] "I assume that commonsense is opposed to making one man pay for another man's wrong * * *. I therefore assume that common sense is opposed to the fundamental theory of agency * * *."

All that needs be said in summary is that this is the clearest of cases. The airman was *given a direct order* by his commander *to travel* from Colorado to Oregon. When he got into this accident he was doing just that, but in a shockingly reckless manner.

"If a master choose to give orders to his servant, no one can fail to understand why he should be held liable for the consequences of their commission. Nor is the case in substance different when he ratifies his servant's act. To stamp what is done for him with the seal of his approval is tacitly, but obviously, to accept the act as his own; * * *." Harold J. Lasky, 26 Yale L.J. 105.

## DAMAGES

 The measure of compensatory damages for pecuniary injuries in Federal Tort Claims cases is governed by the law of the state where the injuries occur, in these cases, Utah.[44] Punitive damages may not be recovered in a death case under the Act, 28 U.S.C. § 2674. The Supreme Court of Utah has interpreted its Wrongful Death Act to allow recovery only for "the deprivation of some service, attention, or care that has in it the element of pecuniary value, * * *". Burbidge v. Utah Light & Traction Co., 57 Utah 566, 571, 196 P. 556, 558 (1921); Evans v. Oregon Shortline Railroad Co., 37 Utah 431, 108 P. 638 (1910)., Ann.Cas. 1912C, 259; 16 Am.Jur. ¶124, § 185; Morrison v. Perry, 104 Utah 151, 140 P.2d 772 (1943). The policy is to compensate survivors rather than punish the tortfeasor.

The court functions as the factfinder in these cases, and must set down the dollar and cent figure. In other cases, this task is performed by a jury, and there is none more difficult.

Whether charging a jury or acting as the trier of the fact, the judge must

---

42. Mechem, 4th Ed. Outlines of Agency, supra, Section 359.

Harold J. Lasky, The Basis of Vicarious Liability, 26 Yale L.J. 105.

Warren A. Seavey, Speculations as to "Respondeat Superior". Harv. Legal Essay 433, Studies in Agency 129.

William O. Douglas, Vicarious Liability and the Administration of Risk, 38 Yale L.J. 584.

Morris, The Torts of an Independent Contractor, 29 Ill.L.Rev. 339

43. Vol. 3, Select Essays in Anglo-American Legal History at pages 404–5, 4 Harv.L.Rev. 345, 5 Harv.L.Rev. 1, 14.

44. 28 U.S.C. § 1346(b), and § 2674, Beesley v. United States, 364 F.2d 194 (10 Cir. 1966), Bartch v. United States, 330 F.2d 466 (10 Cir. 1964), Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

conclude as the Utah Supreme Court does:

"In the final analysis there is no actual *quid pro quo* for wrongful death. The loss of a loved one cannot be measured with any degree of exactness although the right of action granted for wrongful death provides for indemnity only in terms of money."[45]

We tell the jurors that we wish we could give them a more precise means of measuring the reparation for a death, but there is none. And in the end we charge that it is their duty to exercise their sound judgment and good common sense, and to assess such damages as "under all the circumstances of the case may be just."[46] How much is that?

■ The damage award must be a figure somewhere between the extremes established by the evidence; and, in setting the figure, the court must set down its findings with specificity enough that a reviewing court may examine the consistency of the facts and the award.

■ The actual compensation recovered will vary with the valuation of each element of recovery in each case. An award must be tested against the facts of the case itself. Van Cleave v. Lynch,

supra; Morrison v. Perry, supra; Parker v. Bamberger, 100 Utah 361, 116 P.2d 425 (1945); Burbidge v. Utah Light & Traction Co., supra.[47]

■ At least [48] four elements of recovery for wrongful death are recognized in the Utah decisions: (1) loss of support,[49] (2) loss of assistance and services to the family, (3) loss of probability of an inheritance,[50] and (4) loss of society, companionship, happiness of association with a husband and father,[51] and, in the case of the child, the loss of the nurture, guidance and training. Each survivor is entitled to recover for each of these elements. Burbidge v. Utah Light & Traction Co., supra.

There are four cases before us: Nick Platis v. U. S., Kenneth Jones v. U. S., George Maricich, Jr. v. U. S., and Helen N. Day v. U. S.

Day is a death case. Helen N. Day is the surviving wife of decedent. At the time of the accident, June 25, 1965, they were both 40 years old. They were married in 1948. Their 10 year old daughter, Roban, was born in 1955. Under the stipulated life expectancy tables decedent had a life expectancy of 31.6 years, and both survivors had life expectancies in

45. Van Cleave v. Lynch, 109 Utah 149, 161, 166 P.2d 244, 250 (1946).

46. § 78–11–7, U.C.A., 1953; § 5 of Article XVI Constitution of Utah declares: "The right of action to recover damages for injuries resulting in death should never be abrogated, and the amount recoverable shall not be subject to any statutory limitation."

47. Cf. Evans v, Stuart, 17 Utah 2d 308, 410 P.2d 999 (1966).

48. That there may be others is stated in the next note.

49. Spiking v. Consolidated Railway & Power Co., 33 Utah 313, 339, 93 P. 838, 847 (1908), "Under our statute, both the wife and the children were heirs of the deceased, and as such were entitled to recover, not only for the loss of support, companionship, and the assistance he would naturally and probably be to them but were entitled to all the pecuniary loss that they may have sustained by reason of his death, which could be

established with reasonable certainty in view of all the circumstances pertaining to the subject matter." This case is cited by the 3rd Circuit where the cases are collected. O'Toole v. United States, 242 F.2d, 308, 312 (3rd Cir. 1957).

50. Burbidge v. Utah Light & Traction Co., 57 Utah 566, 571, 196 P. 556, 558, "It has also been held that the right of inheritance, that is the probability or improbability of the deceased during his lifetime of acquiring an estate which the heirs would inherit, might be considered in determining the damages, if any, which the heirs had sustained."

51. Burbidge v. Utah Light & Traction Co., 57 Utah 566, 571, 196 P. 556, 558, "It has been repeatedly held by this court that it was proper to submit to the jury, as an element of damages, the loss of the society and companionship as well as the habits of the deceased in respect to his family and what he might be expected to do in the future."

excess of the decedent: the wife 33.1, the daughter 65.4.

Norman Day was a healthy young man, had never had a serious illness or surgery. Mrs. Day's health was equally good. Decedent had maintained a home and lived together with his wife for 17 years and with his wife and daughter for 10 years.

Decedent had established habits of industry and frugality. He liked to work around the home, and performed many tasks about the house. He had considerable mechanical aptitude. At one time he had been a watchmaker and liked to keep his hand in. He maintained all the family mechanical equipment, the car, the truck, the motor boat. He was handy at fixing things—anything around the home that needed repairs, all household appliances, the lawnmower, etc. A family room which he had been building was incomplete at the time of his death. Mrs. Day hired help to finish it. She has been compelled to pay out money to get these items taken care of since his death. In the wife's judgment it has cost and will cost her probably an average of $25.-00 a month to pay for the things furnished by her husband through his own industry.

The family was a close one engaging together in many hunting, fishing, boating, camping, travelling, exploring, picnicking, skiing activities. They enjoyed the same hobbies. He was a bow and arrow hunter so they went out together in the fall before the gun season opened. They all went out on camping trips, and in the summer exploring the desert, ghost towns, mountains, lakes and forests. They got a boat and went to Lake Powell, Flaming Gorge and other similar places. Mrs. Day and her husband and daughter enjoyed "very much" doing outdoor things together.

The husband's attitude and demeanor and relationship with their child was "wonderful". He counselled and taught his daughter in the manner of a good, conscientious, loving father. He was a good husband to his wife. A photograph of the family, the husband, wife and child, taken in 1960, Exhibit 15, shows them up in the mountains at one of the Thousand Lakes, a favorite fishing and picnicking spot. It is a beautiful picture of family felicity—a fine looking man on an outing together with his wife and daughter.

The wife had not remarried since her husband's death.

The decedent had been steadily employed. He used most of his earnings to support his wife and daughter. He did not contribute to the support of anyone besides them.

Decedent's earning record in the 3½ years prior to his death shows a steadily rising income, $1500.00 higher in 1964 than in 1962.

He was a cost accountant and materiel records auditor for Atlantic Research & Missile, a United States missile plant at Green River, Utah. He had worked there since July 10, 1963. Previously, he had worked for United States Steel Corporation for 7 years in their accounting department.

Decedent and his wife had accumulated savings. While he was at the United States Steel Corporation, they accumulated fifteen shares of United States Steel stock through payroll deductions.

The professional character of his work, and the stable and responsible types of his employers show a presumably assured lifetime employment with regular promotions and a steadily increasing salary.

The wife's judgment was that a fair average the husband consumed out of earnings for his personal needs, such as transportation, clothing, food, and recreation, was about $100 a month.

The wife was employed at the Carbon-Emery Bank in Price. Her salary was "probably" $390.00 a month. Her check would go to make payments on the car, a chain link fence around the house, and the like. It was deposited in a common account, but it was pretty well earmarked. The balance was transferred into savings. Between $25.00 and $50.00 a month from her check went into sav-

ings. The wife was not employed at time of trial.

Having in mind the foregoing evidence, we turn to the computation of damages for loss of support.

Day was 40 years of age at the time of the accident and had a life expectancy of 31.6 years. The parties stipulated, as shown by Day's W–2 statements, that during the last three full years of his life his earnings increased $1497, or an average of nearly $500 a year.[52]

The court finds that in the ordinary course of events Day would have had an average salary increase of at least $500 a year for 15 years after his death, or until age 55.

The basis in the evidence for this is: first, the actual experience: his W–2 statements show an average increase during the last three full years of his life of $500.00 a year; second, Maricich's salary at time of accident (June 25, 1965) was approximately $10,000.00 annually, and at time of trial (May 10, 1967) $12,-000.00 annually. Maricich (41) was about the same age as Day, working at same plant, similar kind of work, Day as a materiel record's auditor, Maricich as a materiel program analyst. It appears reasonable to the court to suppose that 15 years after the date of the accident Day would have attained a wage comparable to what Maricich was drawing at the time of the trial. (Day $13,214—Maricich $12,000). Third, Day was presumably assured lifetime employment with regular promotions and steadily increasing salary, because his services were in demand by such employers as United States Steel and Atlantic Research & Missile Corporation, strong, stable, and responsible types of employers. Fourth, also, Day was the kind of man himself who would be expected to advance in his job. He had established habits of industry and frugality. He liked to work, and was steadily employed. He brought his earnings home to support his wife and daughter. He and his wife had accumulated savings, and he had acquired United States Steel stock through the corporation. Fifth, his work as a cost accountant and materiel records auditor in a missile plant was professional in character, in growing demand in this area of sophisticated weapons, missile and space age technology all involving, as a matter of common knowledge, huge government contracts. And, the corporation must have trained and competent men whose cost projections are sound and reliable enough to keep the corporation in business. And, sixth, employer-employee relations being what they are in the modern world, Day's employers most likely would have established schedules of grades and salaries and a program of regular promotions and increases.

 The computations start with Day's gross earnings for 1964 ($7614.-00) from which $2200.00 was deducted ($1200.00, which is the sum Mrs. Day testified her husband used for his own personal needs, and $1000.00 for mileage allowances being paid him annually at time of death). The sum of $300.00 was added to reflect the value of repairs and work performed each year around the home. The resultant figure was $5714.-00 for the year 1964. To this figure was added a projected increase in earnings of $500.00 for the first year following his death, and a similar amount for each of the succeeding 14 years.[53] The computations assume that the yearly increases of $500.00 were paid on the last day of each year, rather than semi-annually,

52. There is an error in Exhibit 18. This Exhibit was prepared by the attorneys to illustrate the computation of "present worth" of earnings using life expectancies and a 4 per cent factor. Applying the 4 per cent factor to an illustrative wage of $8,000 the Exhibit erroneously shows the "present worth" of earnings to be $91,468. Multiplication of

$8,000 by the 4 per cent factor (17.59) produces a figure of $140,720.

53. The propriety of taking into consideration projected increases in earnings is well established. United States v. Sommers, 351 F.2d 354 (10 Cir. 1965); Furumizo v. United States, 245 F.Supp. 981 (D.C.Hawaii, 1965), affirmed 381 F.2d 965 (9 Cir. 1967).

monthly or otherwise. The results are illustrated in detail found in the note.[54]

These computations show no increases in earnings after age 55, do not include anything for retirement, pension or profit sharing or stock option plans. While it is reasonable and appropriate to consider retirement benefits in making an award in such a case as this, none has been included.

The computation does not take income taxes into account. Upon reflection, it is believed that there is no accurate way to do so and that it is too speculative. And, in this case, the result is not unconscionable. United States v. Sommers, 351 F.2d 354, 360 (10 Cir. 1965).

The court has taken into account the commonly known lowered purchasing power of the dollar and the inflationary cycle which may for some time plague our economy.

Day was in the prime of life when he was killed. He had never had a serious illness or surgery, and was a healthy young man. It is reasonably probable he would have lived out his life expectancy of 71.6 years.

Having regard to the evidence in this case as to the professional character of Day's work, the reasonable expectation of increasing demand for skills such as he possessed in the developing technological areas, the probable increase in his proficiency in those techniques and probable opportunities for such a man to serve as consultant, the court has considered that his active future working years probably would have extended to his age 71, his full life expectancy.

In addition to loss of support, Utah decisions allow an award for loss of assistance and services to the family, loss of probability of an inheritance, and loss of society, companionship, happiness of association with a husband and father, and in the case of a child, the loss of nurture, guidance, and training. Each survivor is entitled to recover for each of these elements.

The court awards Mrs. Day a total of $220,000 general damages, which represents an award for all of the elements allowable under Utah decisions.

If the difference between $190,000 and $220,000, that is, $30,000, is regarded as the award to Mrs. Day for the elements of loss of assistance and services, loss of probability of an inheritance, and loss of society, companionship, happiness of association with her young husband, 40 years of age, how can this award be said to shock anyone's conscience?

The child Roban Day, too, is entitled to be compensated for each and all of the foregoing elements of loss. A 10 year old child lost her dad.

54.

| ANNUAL EARNINGS | | | 4% DIS-COUNT FACTOR | PRESENT WORTH ANNUITY | CONVERSION FACTOR TO PRESENT WORTH | PRESENT WORTH CONVERTED TO 6-25-65 |
|---|---|---|---|---|---|---|
| 6-25-65 to 6-25-96 | $6214 | 17.5885 | $109,294.94 | 1.0000 | $109,294.94 |
| 6-25-66 " " | 500 | 17.2920 | 8,646.00 | .9615 | 8,313.13 |
| 6-25-67 " " | 500 | 16.9837 | 8,491.85 | .9246 | 7,851.56 |
| 6-25-68 " " | 500 | 16.6631 | 8,331.55 | .8890 | 7,406.75 |
| 6-25-69 " " | 500- | 16.3296 | 8,164.80 | .8548 | 6,979.27 |
| 6-25-70 " " | 500 | 15.9828 | 7,991.40 | .8219 | 6,568.13 |
| 6-25-71 " " | 500 | 15.6221 | 7,811.50 | .7903 | 6,173.43 |
| 6-25-72 " " | 500 | 15.2470 | 7,623.50 | .7599 | 5,793.10 |
| 6-25-73 " " | 500 | 14.8568 | 7,428.40 | .7306 | 5,427.19 |
| 6-25-74 " " | 500 | 14.4511 | 7,225.55 | .7025 | 5,075.95 |
| 6-25-75 " " | 500 | 14.0292 | 7,014.60 | .6756 | 4,739.06 |
| 6-25-76 " " | 500 | 13.5903 | 6,795.15 | .6496 | 4,414.13 |
| 6-25-77 " " | 500 | 13.1339 | 6,566.95 | .6246 | 4,101.72 |
| 6-25-78 " " | 500 | 12.6593 | 6,329.65 | .6006 | 3,801.59 |
| 6-25-79 " " | 500 | 12.1657 | 6,082.85 | .5775 | 3,512.85 |

$189,452.80

Considering the "wonderful" relationship between daughter and father in this case, the age of the child at the time of his death, and her need for support, advice, companionship and comfort, the court is convinced that $75,000 is a fair, just and reasonable award for the child.

The reasonableness of this award is tested by dividing that sum by 11 years, which would bring her to age 21— through all of those difficult teenage years when a girl is growing up, without her father's support, without the services and assistance which only a father can provide, without his society, companionship, happy association, without the care, nurture, guidance and training of a loving father. If one-half of the award is deemed for support and the balance for all the rest, this award gives her the sum of about $9 a day for support, and another $9 a day for all the rest.

One element of damage for which the girl very properly might be entitled to a larger award is the loss of probability of an inheritance. In the light of the evidence in this case the father, Norman Day, very probably could have accumulated a substantial estate if his opportunity to do so had not been cut short that June morning at the Hanksville cut-off.

The other three cases, before us presently, Nick Platis v. U. S., Kenneth Jones v. U. S., and George Maricich, Jr., v. U. S., are personal injury cases.

The Utah Supreme Court has held that in such cases damages may be assessed for "loss of wages, permanent disability, loss of bodily function, gross disfigurement, prolonged pain and suffering", and, in addition, "such factors as the decreased purchasing power of the dollar, the increased cost of living, the possible continuation of the present inflationary spiral * * *." Duffy v. Union Pac. R. R. Co., 118 Utah 82, 218 P.2d 1080 (1950).

A plaintiff may also recover as special damages medical costs, property damage, and the cost of household help necessitated by the injury, Robinson v.

Hreinson, 17 Utah 2d 261, 409 P.2d 121 (1965), Jorgensen v. Gonzales, 14 Utah 2d 333, 383 P.2d 934 (1963), Paul v. Kirkendall, 1 Utah 2d 1, 261 P.2d 670 (1953).

In the *Robinson* case the court held that the "practical difficulty in assessing future damages" should not "entirely defeat a claim for compensation which is justly due, nor should the settlement have to abide indefinitely." A jury should allow "such damages as it believes from the preponderance of the evidence the plaintiff will with reasonable certainty incur in the future."

Nick Platis at the time of the accident was 36 years of age, living with his wife and five children, at Price, Utah. He suffered a compression fracture of both front and back parts of the third lumbar vertebra, a fracture of the posterior elements of the spine, producing a block between the third and fourth lumbar vertebrae; and multiple contusions (Exhibit 11).

An operation was performed following the accident in an attempt to fuse or stabilize the vertebral bodies by means of a bone graft which extended from the third lumbar vertebra past the fourth and fifth lumbar vertebrae to the first sacrum vertebra. The bone for the graft was taken from the crest of the ilium. The doctor who attended Platis testified that "it didn't form a solid fusion", and that "It's solid above and below, but the one area has worked motion into it." Consequently, according to the doctor, "we're going to have to go back and repair this defect in the fusion and probably add to it on the other side of the spine."

During the operation bone was removed to relieve the block between the third and fourth lumbar vertebrae disclosed by a myelogram. Following surgery in March, 1966, according to the doctor, Platis was somewhat more comfortable but when he began to get up and around and increase his activity he had an increasing amount of discomfort. He was readmitted to the hospital in June, 1966, for a repeat myelogram which disclosed

that he still had some blocking between the third and fourth lumbar vertebrae. The doctor testified that "when this defect in the myelogram was noted we felt that he needed further protection and a body cast was applied." After about 21 days the body cast was removed and he was fitted with a corset. The decision that a further operation is needed was made after X-rays were taken in July, 1966, which disclosed "some motion in the fusion."

When the doctors saw Platis in September, 1965, and later in November and December, he complained of constant pain in the low back, and numbness and pain in both legs. He also had complained of pain in his left shoulder "and a diagnosis of bicipital tendinitis was made." The doctor thought "it was related to the accident." The pain in his legs began "to be aggravated on coughing or sneezing or stooping or bending or activity, and especially on blowing his nose and anything that cause an increase in the amount of pressure."

In response to a question about the injury to Platis' cervical area the doctor testified:

"The fact that he has increasing numbness on the fourth and fifth fingers of both hands would lead us to believe that he has some pressure on the nerve roots in the lower part of the cervical spine. This has been a progressive thing and instead of clearing up as we thought it might to start with. We were so engrossed in the treatment of his major injury, that is, his low back at the time that had a tendency to negate the severity of his pain in his arm and shoulder. However, this has become increasingly more painful as time has gone on. We did have at the time his last myelogram was done, we ran the dye up into his neck and we were unable to see any gross defects in the column of dye or pantopaque that was used. * * *

"I have told Mr. Platis that we know essentially where the nerve roots are that are involving the areas of numbness that he has, and that if this con-

tinues to increase over any prolonged period of time, that he may require surgery to the neck region. * * *

"Well, we expect to free the nerve roots completely and as I mentioned earlier, this is frequently done with the result that they get enough scarring around the areas where the nerve roots are freed to again constrict the nerve to some extent. So the more operations you have, the more scarring you get, and certainly this is no guaranty that it will completely free the nerve roots in that they will stay free."

Under cross-examination the doctor testified further with reference to the cervical region:

"The cervical spine is an area in which there is considerable conflict right now in medical circles. The fact that no fracture shows or the fact that no myelogram defect shows, certainly isn't any indication that there isn't injury because we know that the majority of the injuries to the neck are of a ligamentous and soft tissue nature, and these don't show on X-rays or they don't show on the myelogram. There's still at present a lot of research work being done on this particular area, but there is—it all points to the fact that there is a lot of individual variation in regard to tolerance for the neurological structures in the cervical area. What I'm trying to say is that one X-ray may look terrible and the patient be fine, and another one you can hardly find anything wrong with the X-ray and the patient be in considerable difficulty from pressure on a nerve root."

When asked whether he had an opinion based upon reasonable medical certainty as to whether degenerative osteoarthritis or traumatic arthritis would become evident in Mr. Platis as time goes on the doctor replied that "if we can obtain a solid fusion, I think this within itself negates the * * * chances of arthritis." But, he testified, "in any damaged joint if it continues to move there is no question but what traumatic arthritis develops."

The doctor testified as to Platis' disability as follows:

"I think he's temporarily totally disabled. He can only remain up for an hour and a half, two hours without having severe pain, and in particular a drive—he's told me on several occasions that a drive from here to Price puts him in bed the next day. So I think, as far as his condition is now, he's temporarily totally disabled."

After being asked how long this condition would continue, he testified:

"Well, we expect to proceed with further surgery in the near future, and it is going to be problematical as to what relief he gets. If I could guaranty him a good fusion in this damaged area, I think over a period of time he would begin to increase his—be able to increase his activity."

When asked for his opinion, based on reasonable medical certainty, what the percentage of disability would be if the fusion should be a success, he testified:

"From the standpoint of getting out and earning a living, I would say he would be 50 per cent disabled."

If the fusion was not a success he testified that "I don't think he'll be much better off than he is now, if any."

The doctor testified that after the second operation Platis could be up and around "with some type of support within a period of a month or six weeks, but it will be six months before I'd want him to increase his activity to any extent" or to go back to any gainful employment. Under cross-examination the doctor elaborated upon this as follows:

"* * * I think we're dealing with a different type of thing here from a normal disc incision. This is quite important to him as to whether or not he gets stability in that section of the spine, and you're dealing with an area that has been fractured both front and back parts of the vertebral structure, so I think that I'd be a little more cautious with him than I would the average back operation, certainly."

At the time of the trial Platis had been in the hospital for 86 days, 21 days in a body cast. He had lost 40 pounds and appeared at the trial to be terribly emaciated and dreadfully ill. At the time of the accident he was employed at the Atlantic Research Corporation in Green River, Utah, and was earning approximately $5,700 annually, after excluding a $4 a day travel allowance. His life expectancy was 35.2 years. Stipulated medical expenses to the date of the trial were $4,451.51.

Based upon the evidence in this case, a life expectancy of 35.2 years, a 4 per cent interest factor, and an annual wage of $5,700, the court has computed the present value of the total expected earnings of Platis from the date of the accident to the time of death based upon mortality tables. That value, on the basis of the present 100 per cent disability, is $106,362.

Taking into account (1) the reasonable medical certainty that Platis will be at least 50 per cent disabled even if the surgery is successful in producing a solid fusion and will remain 100 per cent disabled if the operation is not successful, (2) the reasonable medical certainty that Platis sustained an injury, though the extent thereof is not at this time known, in the area of the lower cervical spine, (3) the prolonged pain and suffering he has experienced and with reasonable medical certainty will continue to experience, (4) his loss of wages between the accident and trial and the future loss of wages which with reasonable certainty he will sustain as a result of the accident, (5) the reasonable certainty, established by a preponderance of the evidence, that he will have to incur further surgical and other medical expenses in the future, and (6) such factors as the probabilities of inflation, increase or decrease in the cost of living, periods of economic depression, and retirement, the court concludes that Platis should be awarded general damages of $175,000.

Kenneth Jones, age 26 at the time of the accident, was a materiel control clerk,

282

and now is a materiel records auditor, with Atlantic Research Corporation in Green River, Utah. He is married and the father of two children.

Mr. Jones suffered an acute compression fracture of the first lumbar vertebra, which, the doctor testified, may require a stabilization or fusion of this part of the back. He also suffered a fracture of the olecrannon process (the process of the ulna projecting behind the elbow) of the left elbow, which required an operation and the insertion of two metal pins or screws to reposition the olecrannon process to the main portion of the shaft of the ulna.

His injuries resulted in hospitalization for 48 days in 1965 (Exhibit 12 discloses he was in the hospital 2 days in 1966). The anterior margin of his first lumbar vertebra is not more than half the width of the posterior margin of the vertebral body. He has had discomfort and pain, still has some limitation of motion, about 10 per cent to 15 per cent loss of motion, and "probably" will have "traumatic changes" or "degenerative changes" incident to the injury in his left elbow. If stabilization or fusion of his back is not required "he's bound to get into some degenerative changes from the trauma and the abnormal relationship of the joints in this part of the back with the front or the anterior margin of the body" of the first lumbar vertebra "being only half as wide as it is posteriorally," the doctor testified.

As to Jones' disability the doctor testified:

"I think that he has a 25 per cent disability at the present time with a back of this type if injury. * * *

"I think with a good solid fusion in the area of damage that this could be dropped to 20 per cent. * * * "

As to the convalescent period in the event of an operation to fuse the back, the doctor testified:

"In this particular area of the back, that is, the region in the lower dorsal and upper lumbar regions, the convalescence is longer because more motion takes place in this area of the spine than down low in the lumbar region, and I think that he could probably get back to light work in a matter of three to six months."

Medical costs incurred by Kenneth Jones to the time of the trial were $1,937.73. His life expectancy at the time of the accident was 44.5 years. He was earning approximately $5,000 a year, after deducting $4 a day travel allowances.

Based upon the evidence in this case, a life expectancy of 44.5 years, a 4 per cent interest factor, and an annual wage of $5,000, the court has computed the present value of the total expected earnings of Jones from the date of the accident to the date of death based upon mortality tables. That value on the basis of 25 per cent disability is $25,687.50.

Considering that he has a disability of 25 per cent at this time, which might be reduced to 20 per cent if it becomes necessary in the future to perform an operation to give him stabilization in his back, the prolonged pain and suffering he has had and in reasonable medical certainty will experience, his loss of wages to date of trial and future loss of wages which reasonably may be anticipated, and the reasonable medical certainty that he will have to incur additional medical expenses, and hospital expenses, the probabilities of inflation, increase or decrease of income, increase or decrease in the cost of living, periods of depression, and retirement, the court awards Jones general damages of $36,000.

George Maricich, Jr., 41 years of age at the time of the accident, was also employed at the Atlantic Research Corporation in Green River, Utah, as a materiel program analyst.

He suffered a mild compression fracture of the fifth lumbar vertebra, and injury to the soft tissue structure, which resulted in his hospitalization for about 12 days. Exhibit 13 discloses that he was given hospital care for compression of lumbar vertebrae "concussion and contusions and abrasions forehead and right knee." He testified that sometimes his

leg gives out on him after he has been sitting down for a period of time, or when he bowls. He also has continued to have considerable discomfort in his back, which is aggravated on coughing, sneezing, stooping, bending and climbing.

Mr. Maricich also testified that he suffered an injury to his forehead which has affected his sinuses, and that he bleeds from the nose more often than he had before, and "In fact I don't remember bleeding from the nose before." He testified further that "I can't walk straight, and I don't think I stand up as good as I used to. I don't think I am the man I was before."

The doctor testified that X-rays disclosed "a little break in the continuity of the anterior surface" of the body of the fifth lumbar vertebra which appears "to be a very mild type of compression of the body" of the vertebra. With reference to the back injury the doctor also testified:

"There was no compression to a degree that would affect the joints in this area, and one is dependent somewhat on time and on how much soft tissue damage is done to accurately prognose and, of course, we don't have either one of those."

He also testified:

"Of course, I think that the tendency is to get—to place too much emphasis sometimes on the X-ray appearance, because anything—any injury severe enough to fracture a bone is bound to cause a certain amount of injury to the soft tissues, and this may or may not be evident at the time."

With respect to disability the doctor testified:

"I think that at the present due to the changes that I've seen and the examination in the following of Mr. Maricich, I think that he has between 5 and a 10 per cent disability in the low back region."

When asked as to how long "this situation" would continue the doctor testified:

"The opinion, of course, here is to a great extent dependent upon experience and judgment instead of any one individual case, but it isn't—frequently the average case goes on for several, maybe two or three years with a certain amount of reparative changes going on during that period of time. Now, as I mentioned before, there is no way of knowing whether he is going to get over it in that period of time or whether he's always going to have certain changes that will cause discomfort."

When asked whether Mr. Maricich "suffers from any disability from the accident at the present time" the doctor testified:

"I think that he does have. I don't think that he could get out and do heavy manual labor that he could do before without having rather marked discomfort, considerably more discomfort than he would have had before, and this is disability."

Maricich incurred medical costs of $470.85 up to the time of the trial.

Based upon the evidence in this case, a life expectancy of 30.7 years, a 4 per cent interest factor, and an annual wage of $9,000, the court has computed the present value of the total expected earnings of Maricich from the date of the accident to the date of death based upon mortality tables. The figure of $9,000 as annual wages is based on the testimony of Maricich that at the time of the accident he was earning approximately $10,000 annually. From this figure the amount of $1,000 has been deducted to exclude travel allowances. It is pointed out that as of the time of the trial the annual wage of Mr. Maricich was $12,-000.

The present value of expected earnings of Maricich from the date of the accident to date of death figured on the basis of disability of 7.5 per cent (the doctor testified he had a disability of from 5 to 10 per cent) is $11,670.75.

Taking into account his disability of from 5 to 10 per cent, the prolonged pain and suffering he has suffered, the probabilities of inflation, in-

crease or decrease in income, increase or decrease in cost of living, periods of economic depression, and retirement, the court concludes that Maricich should be awarded general damages of $16,000.